## Koch Election Contest Case.

Argued January 8, 1946. Before MAXEY, C. J., DREW, LINN, STERN, PATTERSON, STEARNE and JONES, JJ.

*Albert H. Heimbach,* for appellant.

*Frank X. York,* for appellee.

OPINION BY MR. CHIEF JUSTICE MAXEY, March 25, 1946:

Edwin M. Koch and Granville F. Rehrig were opposing candidates in the General Election on November 2, 1943, for the office of School Director of the Borough of Lehighton. In the second ward of Lehighton, the election papers delivered to the Return Board [1] showed that 235 votes had been cast for Koch and 206 votes cast for Rehrig.

The tally strokes as counted by the clerks showed a total of 206 votes for Koch and 203 votes for Rehrig, but according to the minority inspector's copy of the tally return sheet, Koch had received 235 votes and Rehrig 206 votes. On November 12th, 1943, the clerks certified their findings to the Return Board, basing them on the total of tally strokes appearing on the general tally return sheet and not on the strokes appearing on the minority inspector's copy. The Return Board confirmed these findings and issued a certificate to Rehrig. On December 6th, 1943, Koch presented a petition pursuant to Section 1701, Article 17, of Act of June 3rd, 1937, P. L. 1333, 25 P.S. 3261 for a recount of the ballots. On

---

[1] The "County Board of Election" is officially composed of the three County Commissioners, as prescribed in Sec. 301 (b) of the Election Code of June 3, 1937, P. L. 1333, 25 P.S. 2641 (b). Inasmuch as the commissioners were candidates for re-election, they were disqualified to serve as the County Board of Election, and Judge James C. McCready, the sole Common Pleas Judge in the County, became the "Return Board", as prescribed in Art. 14, Sec. 1403 of the Election Code of 1937, 25 P.S. 3153 (b). He appointed the clerical personnel of the County Commissioners' office to compute the votes. They are referred to in the record as the "Computation Board" and in this opinion as the "clerks".

December 8th, 1943, the recount was had and it showed 234 votes for Koch and 214 votes for Rehrig.

On December 23rd, a petition was presented by Koch and a rule issued upon Rehrig and the Return Board to show cause why an appeal should not be allowed nunc pro tunc from the clerks' action in the tabulation of the vote for Koch in the Second Ward of the Borough of Lehighton and from the Return Board's action in issuing a certificate of election to Rehrig. On February 21st, 1944, the rule was dismissed and an appeal was taken to the Supreme Court. In our opinion reported in 351 Pa. 544, the lower Court was reversed and Koch was allowed to appeal nunc pro tunc. Such an appeal was taken, and on the hearing which followed the appellant offered in evidence the findings made in the recount of December 8th, 1943 for the purpose of showing that Koch had received 234 votes and Rehrig 214 votes in the Second Ward, thereby giving him a majority of votes in the Borough. To this offer, counsel for Rehrig objected on the ground that this recount having been made "later than five (5) days after the completion of the computation and canvassing of all the returns of the County by the county board", the evidence was incompetent.

The Court sustained the objection, and in compliance with this Court's order, directed a recount of the ballots, but they had been destroyed in 1944, the box not having been impounded. Counsel for Koch then renewed his offer to show the *result* of the December 8th recount, asserting that since the ballots themselves were unavailable, the record of the recount of them should be received as evidence. The Court rejected this offer on the ground above stated. Later the Court dismissed the appeal from the "action of the Computation Board relative to its computation of the vote and the County Board [2] of Election's action in issuing a certificate of election to Granville F. Rehrig."

In January 1945, when this case was first before us, we said: "There is no doubt that the board negligently

[2] This should have been called the "Return Board".

computed the returns . . . The board completely neglected to carry out its statutory duty. Had its duty been complied with, a recount would have been ordered and appellant would have been notified. Furthermore, the county board failed to publicly announce by posting at its office the final result of the election on November 20, 1943, as expressly required by Section 302 (1) of the Election Code, 25 P.S. Sec. 2642. Again, had this been done, appellant would have received notice of the erroneous result before the statutory limitations barred his remedies". These circumstances, we held, entitled Koch to take an appeal nunc pro tunc.

Appellee says of the then action of this Court that it was "for the purpose of placing the petitioner in the same position as he would have been in two days [3] after the election held on November 2, 1943." . . . "The error found by the Supreme Court was that a recanvass was not made by the Board of the ballots, and under these circumstances, for this reason, the lower Court in carrying out the mandate of the higher Court, properly ordered a recount. There being no evidence found in the box, the Court was without authority to do anything except to file a decree finding that no ballots existed upon which to have an adjudication to be certified to the County Board of Election." [i.e. the "Return Board"]

Appellee contends that "Had the appeal been taken before the certification and not later than five days after the completion of the count, there is no doubt the lower Court would have authority to correct the returns and issue a decree to the County Board of Election and

---

[3] Section 1407 (a) of the Election Code, 25 P.S. 3157, provides that "any person aggrieved by any order or decision of any county board regarding the computation or canvassing of the returns of any primary or election . . . may appeal therefrom within two days after such order or decision shall have been made . . . to the court of common pleas." Section 1703 (a) of the Election Code, 25 P.S. 3263, places a five day limitation on the filing of any petition "to open a ballot box or to recanvass the votes on a voting machine", "after the completion of the computation and canvassing of all the returns of the county by the county board".

that under those circumstances the computation arrived at, in the recanvass could have been used; but since the certification had been made at the date of the recanvass and more than five days having lapsed after the computation, the evidence secured by this recanvass is now barred for any purpose, excepting that of a criminal prosecution."

The answer to that contention is that since an appeal nunc pro tunc has been allowed, the appellant must be placed in the same position in respect to his rights as he would have been in had his appeal been taken during the period prescribed by statute. An appeal nunc pro tunc is of little avail in any case unless the appellant is accorded all the rights, so far as it is practicable to do so, which would have been his had he taken his appeal in due course.

The decision of the Court below means that owing to our decision when this case was before us in 1945, the appeal to the Court below must be treated as a "timely" one; but that since the ballots, the primary evidence in the case, had disappeared from the box, evidence as to *what* those ballots disclosed when they were recounted on December 8, 1943 cannot be received. We cannot accept this reasoning or its conclusion. If, for example, there had been photostatic copies made of the ballots before the recount got underway and the original ballots themselves had then been destroyed, it would have been unjustifiably technical to hold that the photostatic copies could not be received as the basis of the recanvass because they were not in fact the actual ballots. Properly accredited secondary evidence is always received in evidence in lien of nonexistent primary evidence unless the reception of such evidence is positively forbidden. In the instant case, the secondary evidence offered consisted of "the findings of the recount the Board made on December 8, 1943". The correctness of these findings was not challenged; they were denied as evidentiary character because the recount on which they were based

was made "later than five (5) days after the computation and recanvass of all the returns . . ." The lateness of the recount certainly did not destroy or impair the probative value of its revelations. A recount having in fact been made, the aggrieved party obtained a rule to show cause why an appeal from the action (obviously erroneous) of the Computation Board should not have been allowed nunc pro tunc.

The order of the court below discharging that rule was reversed by this Court. We held that a proper case for an appeal nunc pro tunc had been made out. The appeal to the Court below followed. At the ensuing hearing no competent and relevant evidence of the fact in issue should have been rejected. The official record of the recount of December 8, 1943 was competent and relevant. The fact that the recanvass was made five days after the computation and recanvass of all the returns did not affect the probative value of the record of that count. The statutory five day limitation should have been invoked (if it was to be invoked at all) when the petition was presented to open the ballot box, [under Sec. No. 1701 of the Election Code of 1937, 25 P.S. 3261 (For the five day limitation see Section 1703, 25 P.S. 3263).]

Unless prohibited by statute [4] or by some policy of the law, any probative evidence is ordinarily received on any issue if it is the best evidence available. Blackstone in his Commentaries, Book III, 368, said: "The one general rule that runs through all the doctrine of trials is this,—that the best evidence the nature of the case will admit of shall always be required, if possible to be had; but, if not possible, then the best evidence that can be had shall be allowed." Thayer in his "Preliminary Treatise on Evidence at the Common Law", says p. 530: "The rules of evidence should be simplied; and should take

---

[4] "The law sometimes . . . makes a certain writing the exclusive memorial. The chief representative type of this class is the judicial record". "Wigmore on Evidence" 3rd ed. Vol. 4, sec. 1241(4).

on the general character of principles, to guide the sound judgment of the judge, rather than minute rules to bind it. The two leading principles should be brought into conspicuous relief, (1) that nothing is to be received which is not logically probative of some matter requiring to be proved; and (2) that everything which is thus probative should come in, unless a clear ground of policy or law excludes it." He also says: (p. 490) "The true meaning of the rule of law that requires the greatest evidence that the nature of the thing is capable of is this, that no such evidence shall be brought which ex natura rei supposes still a greater evidence behind in the parties' own possession and power." . . . (p. 491) "In 1740, Lord Hardwicke declared that 'the rule of evidence is that the best that the circumstances of the case will allow must be given. There is no rule of evidence to be laid down in this court but a reasonable one, such as the nature of the thing to be proved will admit of.' " [5]

Henry's "Pennsylvania Trial Evidence", Second Edition, Section 181 says: "The rule requiring production of the best evidence calls for the best that can be produced at the time it is offered." (Citing cases) ; Section 187: "Secondary evidence is admissible whenever a satisfactory reason for non-production of the original is given, as for example, where it is lost or destroyed, or beyond the jurisdiction of the court". (Citing cases) ; in *Luce v. Snively,* Vol. IV, Watts, p. 396, it was held that the record of the acknowledgment of a deed, being the next best evidence of the execution of it and of its contents, became admissible in the absence of the deed itself.

In *People v. Pease,* 27 N. Y. 45, 55, it was said : "What is it that confers title to the office, and the legal right to the reception of its emoluments? It surely is the fact that the greatest number of qualified voters have so declared their wishes at an election held pursuant to law. It is not the canvass, or estimate, or certificate which de-

---

[5] *Llewellin v. Mackworth,* 2 Atk. 40; *Villiers v. Villiers,* ib, 71.

termines the right. These are only evidences of the right but the truth may be inquired into, and the very right, ascertained."

In *Howard v. Shields,* 16 Oh St. 184, 191, it was said: "The question to be decided in an election contest is: Which party received the greatest number of legal votes? . . . To hold that, when an election has been in fact held, and the majority of the legal voters have in fact, and according to the prescribed forms of law, cast their ballots for the candidates of their choice, the constitutional rights of the voters, and of their candidates, can be defeated by a mere misprision or omission of the judges or clerks, would be manifestly unjust and contrary to the plain intent and spirit of our election laws. Such a result should be permitted only in cases of necessity arising from the want of proper means to ascertain with reliable certainty, the facts of the case."

In the instant case, the truth as to which of the two candidates received the highest number of votes should be "inquired into" and "the very right ascertained"; under the applicable rules of evidence. We think there was in this case *no* "want of proper means to ascertain with reliable certainty the facts of the case" by the use of the best evidence producable under the circumstances.

Both the Court below and appellee's counsel seemed to rely for the support of the position they assumed, on the provisions in paragraph (c) of Section 1703 of the Election Code reading as follows: "If upon the opening of any ballot box or recanvass of any voting machine under the provisions of this article, it shall be found that fraud was committed in the computation of the votes cast on the ballots or voting machine, or in the marking of the ballots contained therein or otherwise in connection with such ballots, the county board shall take such steps as shall be appropriate to enable the ballot box and contents thereof or voting machine to be available as evidence in any prosecution which may be begun against any person or persons alleged to be guilty of such fraud."

· We do not see the applicability of this provision to this case. Its obvious purpose is to secure the preservation of the evidence of fraud which the opening of the ballot box and the recounting of the ballots disclose so that this evidence will be available in a subsequent criminal prosecution of those allegedly responsible for the fraud.

Appellee contends that "since the certification had been made at the date of the recanvass and more than five days having lapsed after the computation, the evidence secured by this recanvass is now barred for any purpose, excepting that of a criminal prosecution". This contention we reject. In our opinion in this case in 351 Pa. 541 we noted that the fact that the statutory periods of limitation "had all expired before the appellant learned of the board's erroneous action", and we held that the appellant's explanation of this delay was such as to entitle him to appeal to the court below nunc pro tunc. We now hold that the evidence produced by the recount held on December 8th, 1943 is *not* (as claimed) "barred for any purpose, excepting that of a criminal prosecution". The evidence should be received so that it may be rightfully determined whether Edwin M. Koch, the appellant, or his opponent, Granville F. Rehrig, was in the general election on November 2, 1943, elected to the office of School Director of Lehighton.

. The judgment of the court below is reversed and the record is remitted to it for further proceedings in accordance with this opinion.

———

DISSENTING OPINION BY MR. JUSTICE JONES:

On the former appeal in this same matter (351 Pa. 544, 41 A. 2d 657), we afforded the appellant *equitable relief* by granting him leave to appeal *nunc pro tunc* from an alleged erroneous computation by the Return Board of Carbon County to the end that, should a recanvass of the ballots warrant it, the Board's return

might be corrected accordingly and the certificate of election, which it had issued to the appellant's opponent, vacated. The time fixed by law for such an appeal had expired before the appellant filed his petition in the court below. We acted as above stated in order that what appeared to be a clear clerical error in the tabulation of the votes respectively received by the appellant and his opponent could be correctly recorded and the will of the electorate, as reflected by the ballots, thereby ascertained and honored. However, it now appears from a later decision by this court that equity does not have jurisdiction to grant relief in an election case on the prayer of one who has not followed the exclusive procedure prescribed by law for action in such regard: see *Thompson v. Morrison, Secretary of Commonwealth,* 352 Pa. 616, 44 A. 2d 55.

Whether or not our former decision in this matter was correct, another and far different question intrudes on this appeal. The court below, pursuant to our former order, entertained the appellant's *nunc pro tunc* appeal and entered upon a hearing for the recount of the ballots. It then developed that they had been destroyed in 1944, as allowed by law, no application having been made for their preservation beyond the eleven-month period following the election: Sec. 309 of the Act of June 3, 1937, P. L. 1333, Art. III (25 P.S. § 2649). The appellant thereupon offered in evidence the tabulation of a recount had on December 8, 1943, upon his petition under Sec. 1701 of the Act of 1937, supra (25 P. S. § 3261). The court below sustained the appellee's objection to the offer on the ground that inasmuch as the recount had not been had within five days of the completion of the certification of the return of the vote cast at the election, the recount was legally inefficient to change the return already made. That ruling, I believe, is in strict compliance with legislative mandate.

Paragraph (a) of Sec. 1703 of the Act of 1937 provides that, if, upon the opening of a ballot box under

Sec. 1701 "before the certification of all the returns of the county, and, in no event, later than five (5) days after the completion . . . of all the returns . . . by the county board, and the court shall discover therein any fraud or error, the court shall correct, compute and certify to the county board the votes justly, . . . and the county board shall correct accordingly any entries previously made in the returns . . . not yet certified." Paragraph (b) of Sec. 1703 further provides that ". . . *no such order or decision [upon a recount of ballots under Sec. 1701] shall affect the official returns of any election district, unless a petition to open the ballot boxes . . . shall have been presented before the certification of the returns . . . by the county board ... ."* (Emphasis supplied.)

However, assuming that the effect of the allowance to the appellant of a right to appeal *nunc pro tunc* from the computation was to render inoperative, for all present purposes, the legislative directions above-cited, it is my opinion that the tabulation obtained from the recount of December 8, 1943, was otherwise incompetent for the purpose for which it was offered. The hearing was concerned with a recanvass, computation and return of the votes cast as disclosed by the *ballots;* and the tabulation did not qualify in any sense as secondary evidence of the *ballots*. It was at best but a computation of the number of marks appearing on the ballots opposite the respective names of the contending nominees for the office of school director. But, a ballot discloses far more essential to a recount than is shown by a tabulation of the vote for a particular office. A ballot contains the evidence of its own validity or invalidity in general. It must have been marked not otherwise than by a pencilled cross or crosses within an appropriate square or squares. It may not contain the ballot-number stub of the elector and remain valid. Nor may it have any other distinguishing marks capable of identifying the elector. One defect on a ballot (not in respect of the vote for the

*particular* office which the appellant caused to be re-counted) might invalidate that ballot in its entirety. It is manifest, therefore, that unless the ballots or fac-similes of them can be produced, it is not possible to have what can be thought to be a recount of the ballots; and such a recount was what the allowance of an appeal *nunc pro tunc* in this case contemplated. That does not mean that, upon a recount for a particular office, the votes for all offices must be retabulated. But, if there is an invalidity in any part of a ballot, its effect on the whole ballot must be considered and correctly reflected. The illustration given in the majority opinion as to photostatic copies of ballots goes directly to the point here made. If such copies of the ballots were available and the ballots themselves had been lost or destroyed, the copies *would* constitute secondary evidence of the ballots and, as such, be admissible in the circumstances supposed. But, figures cannot in my opinion be said to be secondary evidence of the ballots.

The importance of the question here involved ought not be obscured by the apparent merit of the appellant's contention that more votes were cast for him than for his opponent. The principle which allows for the recon-struction of what ballots are supposed to show by mak-ing use of figures as to the number of ballot markings for a given office, which figures were obtained upon a re-count that never legally achieved an effective role in the *official* canvass and return of the vote, is fraught with such possibilities of danger to the integrity of the ballot that I find myself unable to concur in the ruling now made by the majority.

If the appellant received a majority of the votes cast for the office, he should, of course, have been given the certificate of election. But, it is not to be overlooked that he has been far less than alert in protecting his rights. The equity which he stressed upon his applica-tion for leave to appeal *nunc pro tunc* lay entirely in what others had failed to do in the discharge of their

official duties and without consideration for what *he* could have done but did not do. His most crucial dereliction was, perhaps, his failure to have the ballots preserved, as he could easily have done by an application to the court for an order to that effect: see Sec. 309 of the Act of 1937.

I should affirm the judgment of the court below.