L. C. S. Colliery, Inc., Appellant, *v.* Globe Coal Company.

2

Argued September 26, 1951. Before Drew, C. J., Stern, Stearne, Jones, Bell, Ladner and Chidsey, JJ.

reargument refused December 26, 1951.

*Sebastian C. Pugliese,* with him *Thomas S. Barbor, James W. Mack, Jr.* and *Arnold D. Smorto,* for appellant.

*Frank P. Barnhart,* with him *James L. Jack,* for appellees.

Opinion by Mr. Justice Ladner, November 13, 1951:

Plaintiff appeals from the decree of the chancellor, confirmed by the court en banc, dismissing its bill for specific performance of an agreement to convey certain real estate.

The facts as found by the chancellor show that on the 19th day of September, 1940, plaintiff's assignors, as lessees, entered into an indenture of lease with the defendant corporations, namely, the Globe Coal Com-

pany and Pennsylvania Land Company, by which indenture the lessees were given the exclusive right to mine the coal in certain land described in said lease. The leased premises included buildings, mines, tipples, machinery and fixtures thereon located.

By the terms of this lease the lessees were to pay lessors as rent or royalty 15¢ per gross ton removed and sold, to be paid in the following manner: 5¢ per ton to American Trustee & Transfer Corporation, Trustee; 5¢ to the lessors, and 5¢ to the First National Bank in Indiana, Pennsylvania, until certain obligations of the lessors to said bank had been paid. When said bank obligations were paid then that 5¢ part of the royalty was to be paid to the American Trustee & Transfer Corporation, Trustee, until a $5,000 indebtedness with interest, due by the lessors to said Trustee, had been paid. Thereafter 10¢ of the royalty was to be paid to the lessors.

Paragraph 13 of Article V of the lease is important. It conferred on the lessee the right to deduct from the rents or royalty payable to the lessors "so much money as the said lessee *is required to pay on any debt or obligations of the Globe Coal Company or Pennsylvania Land Company in order to continue the operation of the premises hereby leased.*" (emphasis supplied)

Also by the lease[1] the lessors agreed that when the rentals and royalties paid to the lessors amounted to $32,500.00 the lessors would convey to lessees a portion of the leased property described as Purpart "B" of Article I of the lease.

---

[1] This provision is paragraph 16 of Article V and reads: "Sixteenth: When the lessee has paid rentals and royalties in the amount of $32,500.00 to the lessor which shall be in addition to the sums paid to the American Trustee & Transfer Corporation, Trustee, and the First National Bank in Indiana, as provided for in Article III of this lease, the lessor will, at its own proper cost

Plaintiff (here appellant) claiming that it had paid the requisite amount of royalty brought its bill for specific performance to enforce the conveyance of Purpart B. The issue was whether the plaintiff had in fact paid the requisite amount.

The chancellor found that the plaintiff had not paid the $32,500.00 required to be paid and was in fact entitled only to credit in the sum of $23,562.61, leaving the amount still due before being entitled to the deed of $8,937.39.

The appellant makes two contentions: First, that the learned court below erred in disallowing certain claims or debts of the lessors totalling $9,093.12 allegedly paid on lessor's behalf under paragraph 13 of the lease. The items comprising this total will hereinafter be considered separately. Second, the appellant contends that even if the disallowance of the credits claimed was proper, nevertheless it should be permitted to have specific performance conditioned on the payment of the proper balance found to be due and therefore it was error to dismiss the bill.

On the first question, the case turns on whether payments made to creditors of the lessors were within the terms of paragraph 13 of Article V of the lease,

---

and charge make, execute and deliver to the lessee, a good and sufficient deed for the proper conveying and assuring of the premises described in Purpart 'B' of Article I of this lease, together with all mining equipment on the premises, in fee simple, free from all encumbrances; such conveyance to contain the usual covenants of general warranty. And the said lessee shall have the right to anticipate the payment of the said $32,500.00 at any time and thereupon be entitled to a deed as aforesaid. After the lessee has paid to the lessor the sum of $32,500.00 in royalty as hereinbefore provided, the lessor shall not be entitled to any further royalties and the only royalty to be paid by the lessees will be five cents (5c) per gross ton to the American Trustee & Transfer Corporation, Trustee."

and therefore properly deductible from royalties due defendants. The learned court below correctly held that in order to allow such payments as credit it was necessary for plaintiff to show that they were obligations of the lessors necessary to be paid in order to continue the operation of the leased premises. The court found adversely to plaintiffs as to payments aggregating $9,093.12, and as the appellant charges this to be error it becomes necessary to review each payment separately.

The first credit rejected by the court below was to M. Glosser and Sons in the amount of $407.48. From the testimony it appears that Glosser and Sons had leased to the Globe Coal Company (one of the lessors) a 150 kilowatt generator under a bailment lease; that Glosser and Sons threatened to retake possession of the generator, and the generator was necessary to the operation of the mine in that it created D. C. power to operate the equipment. There was testimony that without a generator the mine could not be operated at all. This testimony was not contradicted. As to this bill, Jacob Gordon, for the defendant lessors, merely testified that, "If it is proper debt and belongs to the Globe Coal Company we have no objection to paying it." There was no denial that the generator was leased by Glosser under a bailment lease or that the bailor had threatened to repossess it, nor that it was not essential to the operation of the mine. However, the learned court below disallowed the credit because Jacob Gordon the Secretary of Globe Coal Company was not shown to have the authority of the lessor corporation to authorize the payment, nor was the Globe Corporation shown to be a one-man company.

The right to this credit in no sense depended on the payment being authorized by Gordon. The learned chancellor could and should have found that the Glosser payment was properly chargeable against

royalties because unless paid the generator might have been repossessed and the operation of the mine interfered with. The right to pay a debt of this kind was secured by and fairly within the power conferred on the plaintiffs by paragraph 13 of Article V of the mine lease.

But even if authorization to pay this claim had been required of Gordon, there was sufficient testimony to show that Gordon had ample authority to conduct the affairs of the two corporations in regards to payments due lessors under the lease. It appears of record that Gordon was the president of the Pennsylvania Land Company which he testified was an inactive company, had no office and no bank account. That the checks for royalties paid which defendants acknowledged were paid, were drawn to the Globe Coal Company, most of which were not deposited in the company's account but cashed by Gordon in Johnstown, Pa., some being endorsed "Globe Coal Company, Jacob Gordon Secretary" others endorsed, "Globe Coal Co., Jacob Gordon, owner" and some "Globe Coal Co., Jacob Gordon Secretary and Owner." Gordon also signed the Answers to the various pleadings as Secretary of the Globe Coal Company and President of the Pennsylvania Land Company, and testified he was authorized to direct payment of the Pennsylvania Electric bill for which credit was allowed by the court below.

The next credit claimed by appellant but disallowed by the learned chancellor was for $76.92, due by Globe Coal Company to Amundson Brothers of Punxsutawney for repairs to a pump. This pump formed part of the equipment leased to lessee with the mine. It required repairs and it was sent to Amundson Brothers for that purpose. After the repairs were made Amundson Brothers refused to surrender possession until a prior bill incurred by Globe Coal Company for repairs on

the same pump was paid. The learned chancellor rejected this credit for the same reason that he rejected the Glosser payment just reviewed. What we said concerning that claim applies with equal force to this and we therefore hold the disallowance to be error.

The third credit disallowed was for $292.87, paid July 21, 1942, to Nick Cavallo & Brother, of Johnstown, Pa. It was testified on behalf of the plaintiff that Gordon arranged with Mr. Campdon of the plaintiff corporation to pay out of the royalties a bill of groceries he was about to purchase from Cavallo; that plaintiff agreed to this and did so. Gordon's testimony was rather vague and amounted merely to a statement that he did not remember whether he requested payment of the Cavallo bill or not. However, the learned chancellor rejected this claim because it was not a debt of the Globe Coal Company or the Pennsylvania Land Company. In so ruling he was clearly right. The authority under paragraph 13 of Article V of the lease to deduct debts from royalties extended only to debts of the lessor corporations and not to personal debts of their officers. Express authority of the corporation had to be shown in this instance for the matter was not one within the scope of the officer or agent's apparent authority as in the two prior debts herein allowed.

The fourth credit claimed was for a total of $5,-315.85, paid by the appellant to the Collector of Internal Revenue for federal taxes due by the Globe Coal Company. According to plaintiff's evidence, it appears that a levy and attachment were made against the leased premises by federal revenue agents. If such levy and attachment were in fact made, payments out of royalties to relieve the attachment and the levy were undoubtedly justified pursuant to the power conferred by paragraph 13 of Article V of the lease authorizing payments of debts necessary to continue operation. The learned chancellor, however, disallowed the claim for the rea-

son that though plaintiff's witnesses were competent to testify as to the fact of payment, yet as to the existence of a levy or attachment of such character that payment was required to keep the mine in operation, the court held it to be hearsay and incompetent and therefore rejected the credits claimed.

At this point we must say the record of this case as printed leaves much to be desired. Not only does it omit important exhibits bearing on the question but we find even the original record which we examined lacks the exhibits admitted in evidence; e.g., it is important to know when these taxes were paid. The record shows the checks evidencing the payments were offered in evidence as exhibits numbers 5 and 6, yet these exhibits are neither printed nor included in the original record. Nor do we have any fact finding giving us the date. After searching vainly through the record we find some evidence bearing on the date in a letter of the Collector of Internal Revenue dated June 17, 1948, referring to levy issued October 11, 1940, from which we may infer the payments were made about that time. However, the testimony of J. L. Jones gives a different date as to the levy for which the payment was made by Exhibit number 6 as May 27, 1943. Apparently, there were two claims for which levies were made, but both dates were after the date of the lease.

We do not agree with the learned court that the evidence establishing the levy and attachment was incompetent. Certainly the testimony of Mr. Campdon, the President of the appellant was not hearsay. He testified that two agents of the Revenue Department came to the mine and attached everything belonging to the Globe Coal Company and the Pennsylvania Land Company serving him with papers and posted notices *which he saw*. We think the learned trial judge meant to say the evidence was incompetent because it was not the best evidence to establish the fact of levy and attach-

ment. While it is true that the best evidence which a party must always produce if possible, would have been the official records of the Collector's office, yet if they could not be produced, the facts could be otherwise shown. The late Chief Justice MAXEY in *Koch Election Case,* 353 Pa. 619, 625, 46 A. 2d 263 (1946). quotes with approval the statement of Henry's Pennsylvania Trial Evidence, viz.: " 'The rule requiring production of the best evidence calls for the best that can be produced *at the time it is offered* (emphasis supplied). . . . Secondary evidence is admissible whenever a satisfactory reason for non-production of the original is given, as for example, where it is lost or destroyed, or beyond the jurisdiction of the court.' "

In this case such satisfactory reason appears from the letter which the chancellor received in evidence written by the Collector of Internal Revenue addressed to the President of the appellant company pursuant to statement of appellant's counsel that he had gone to Pittsburgh with subpoena for the purpose of obtaining the records involved and was informed they were no longer in existence. This information was confirmed by the Collector's letter[2] admitted in evidence.

---

[2] This letter reads:

"Dear Mr. Campdon:

In compliance with the request of Thomas S. Barbour, Esq., this communication will confirm the absence of the official record of notice of levy issued to your firm on October 11, 1940, as garnishee, for unpaid taxes owing to the Government at that time by the Globe Coal Company and the Franklin Coal Company, Heshbon, Pennsylvania.

The record of payments made by your firm, as garnishee, likewise have been destroyed as inactive records which have been held for the time prescribed by regulations and authorization granted for their destruction.

Very truly yours,

Stanley Granger,

Collector."

This explanation of non-existence of the best evidence made competent the secondary evidence of the levy which had been previously offered which may be summarized as follows: Mr. Campdon, the president of the appellant, testified that U. S. revenue agents came to the mine and served him with a paper and attached everything that belonged to the lessors and posted on the mine premises notices which witness personally saw. Another witness, Jones, testified the government's claim was paid by two checks, exhibits numbers 5 and 6, offered in evidence, for $4,000 and $1,315.85 respectively, drawn to the order of the U. S. Collector of Internal Revenue. The same witness testified that Gordon told him to pay the levy claim of $4,000 and that later Gordon visited the Collector and had the other levy claim of $1,569.37 reduced to $1,315.85, which was then paid by check offered as exhibit number 6. That Gordon knew all about the levy and attachment as well as the payments of the government's tax claim and that the payments were made with his knowledge and acquiescence if not by his express direction is abundantly clear. Gordon's testimony on the point was unsatisfactory and evasive, but the learned chancellor finally pinned him down with the question: "As I understand, what Mr. Sciotto is asking you is, when you found out they had paid this tax or were going to pay the tax, whether you said to the L. C. S. 'You are not allowed to pay that tax out of royalties and charge me with it;' did you tell them not to do that? A. I don't remember, your Honor. The reason probably I didn't say for them not to pay, they didn't pay us any royalty. I figured we owe the government, so might as well for them to pay it; they didn't pay us any."

But, of course, the right to pay the government tax claim to release its levies and attachments depended neither on the consent of Gordon nor proof of his au-

thority to direct such payment. There being competent proof of the levy and attachments, the irresistible implication of what would follow is clear. Unless the claim was paid, the mine and equipment would be sold by the U. S. Collector. The payments to prevent this eventuality were therefore clearly within the authority conferred on the lessees by paragraph 13 of Article V of the lease and necessary "to continue the operation of the leased premises." Therefore the learned court below erred in disallowing this claim.

The final credit claimed is for $3,000 store rental for a period of five (5) years at $50.00 per month later increased by amendment to $4,400. The evidence on this claim is unsatisfactory and indefinite. We agree with the learned chancellor in ruling that this item being in the nature of a set-off was not under the evidence a proper credit against the royalties payable under the lease.

We also agree with appellant's second contention, namely, that it was error under the special circumstances of this case for the chancellor to have dismissed the bill instead of decreeing specific performance conditioned on payment of the balance the court found to be due. While there was no express prayer for this in the bill of complaint, nevertheless the chancellor might have granted such a decree under the prayer for general relief and would no doubt have done so had it been asked for by appellant's counsel. This because there was no time stipulated in the lease for the payment of the requisite amount of royalties. Where time of performance is not specified a reasonable time is implied: *Marshall Construction Co. v. Forsyth,* 359 Pa. 8, 57 A. 2d 902 (1948) ; *Frechie v. Boyd,* 100 Pa. Superior Ct. 553 (1930). Even where a time is fixed but is not made the essence of the agreement, expressly or by necessary implication, the strict rules of law of tender and pay-

ment are not applicable: *Remington v. Irwin,* 14 Pa. 143 (1850); *Sylvester v. Born,* 132 Pa. 467, 19 A. 337 (1890). Especially is this so in cases involving unsettled accounts between parties (49 Am. Jur., Specific Performance, §146, p. 170)[3] or where, as here, there is an honest dispute concerning the amount of payments and credits for payments made to third parties authorized by the terms of the contract. Under such circumstances it is sufficient for the purchaser to show a willingness and ability to pay such amounts as may be found due by the court.

The decree of the court below is reversed, and the record remanded with directions to allow appellant additional credits as follows: payment to Glosser & Company $407.48, Amundson Brothers $76.92, Collector of Internal Revenue $5,315.85, totaling $5,800.25, and to enter a new decree that upon payment of the balance due, viz., $3,137.14, together with legal interest thereon from the date of the filing of the bill of complaint, to wit, October 19, 1945, within 30 days of the date of its decree the defendants shall make, execute and deliver a proper deed for the Purpart B as described in and by the terms of the lease in question. Each party to pay its own costs.

[3] Citing *Prout v. Roby,* 82 U.S. 58, 21 L. Ed. 58 (1872); *Lewis v. McCreedy,* 378 Ill. 264, 38 N. E. 2d 170, 138 A. L. R. 198 (1941). The latter case states, "The general rule is, that to entitle a purchaser to demand a deed and maintain a bill for specific performance, it is sufficient that he is ready and offers to pay any sum that may be found to be due and still unpaid and to comply with the contract on his part."