401 A.2d 1333

EASTON THEATRES, INC., Appellant,

v.

WELLS FARGO LAND AND MORTGAGE CO., INC., and Northeastern National Land Co., Inc., Individually and d/b/a 25th Street Shopping Center.

WELLS FARGO LAND AND MORTGAGE CO., INC., Appellant,

v.

EASTON THEATRES, INC., Appellees.

Superior Court of Pennsylvania.

Argued June 15, 1978.

Decided April 12, 1979.

Petition for Allowance of Appeal Granted Oct. 10, 1979.

336

338

H. Donald Busch, Bala Cynwyd, for appellant at No. 175 and appellee at No. 184.

James C. Hogan, Easton, for appellants at No. 184 and appellees at No. 175.

Before JACOBS, President Judge, and HOFFMAN, CER-CONE, PRICE, VAN der VOORT, SPAETH and HESTER, JJ.

SPAETH, Judge:

This cases arises on cross appeals in an equity action. The issues raised involve whether there was a breach of contract, and if there was, whether the chancellor should have awarded monetary damages in addition to specific performance.

On February 29, 1972, Easton Theatres, Inc., entered into a written lease with Wells Fargo Land and Mortgage Co., Inc. The lease provided that Easton would let from Wells Fargo a 13,000 square foot theatre building, to be built on land Wells Fargo owned in the 25th Street Shopping Center in Palmer Township, Northampton County. The building was to be built by Wells Fargo in accordance with plans and specifications to be prepared by Easton's architect. In the spring of 1972, the parties encountered problems in connection with the proposed construction site. Accordingly, they agreed that the theatre building should be built in another part of the shopping center, on land owned by Northeastern National Land Co., Inc.[1] On July 17, 1972, the lease was amended to add Northeastern as an additional party and to formalize the change of construction site. Wells Fargo remained a party to the lease because its land was to be used for the erection of signs and additional parking facilities. Otherwise the terms of the lease were not changed.[2]

As regards the present case, the following terms of the lease are important. Within sixty days of the execution of the lease, Easton was to prepare final plans and specifications for the theatre building. Wells Fargo then had fifteen days to approve or reject the plans and specifications. Construction of the building was to commence no later than

1. Northeastern and Wells Fargo are both closely-held corporations, with the same sole shareholder and chief executive officer. See N.T. Aug. 15, 1975, at 319.

2. Because Northeastern's rights and liabilities are for purposes of this appeal identical to Wells Fargo's, both corporations will be referred to under the single name "Wells Fargo."

sixty days from the execution of the lease or thirty days after Wells Fargo's approval of Easton's plans and specifications, whichever date was later, and was to be completed within one hundred twenty working days from the commencement of construction. Wells Fargo's financial commitment for the construction was limited to $215,000, but Easton had the option of paying for construction costs over that figure. If Wells Fargo was unable to obtain a mortgage loan of $215,000 within sixty days of the execution of the lease "on terms of a twenty (20) year payback with interest not to exceed 9½% and with the lease premises as the only security, provided no extreme conditions as to pre-payment of Landlord," Easton was to attempt to obtain such financing for Wells Fargo. See Lease Addendum at 3. If within sixty days Easton could not obtain such financing, either party had the right to cancel the lease.

Following the signing of the lease, as amended, on July 17, Wells Fargo made preliminary inquiries regarding obtaining a mortgage loan for the construction of the theatre building; however, it did not submit any written application for a mortgage to any potential mortgagee, and it did not obtain financing. On September 27, 1972, the parties by their agents agreed that Easton would attempt to obtain a mortgage. As of that date, Easton had not completed final plans and specifications for the building, although it had furnished Wells Fargo with preliminary schematics of the building in June. During the fall of 1972, Easton did obtain a mortgage commitment from one of its affiliated companies. Wells Fargo rejected this commitment on the ground that the terms of the commitment contravened the terms of the lease. Negotiations between the parties continued, and during the first quarter of 1973, Wells Fargo indicated to Easton that it was still willing to accept a mortgage commitment if this commitment conformed to the terms of the lease. On April 16, 1973, Easton obtained a permanent mortgage commitment in the amount of $215,000 from the Continental Bank in Philadelphia. This commitment was communicated to Wells Fargo on or about April 27, 1973.

Wells Fargo rejected this commitment, again on the ground that its terms contravened the terms of the lease. At the time Wells Fargo rejected this commitment, Easton had not yet completed final plans and specifications for the building.

On July 16, 1973, Easton filed a complaint in equity seeking specific performance of the lease and monetary damages. On June 7, 1977, following a seven day trial, the Chancellor issued an adjudication consisting of findings of fact, conclusions of law, discussion, and a decree nisi. The Chancellor found that Wells Fargo did not breach the lease by rejecting the first mortgage commitment, from Easton's affiliated company, because the commitment contravened the terms of the lease, but that Wells Fargo did breach the lease by rejecting the second commitment, from Continental Bank. He also found that the 25th Street Shopping Center was "ideally suited" for a theatre. The Chancellor ordered Wells Fargo to perform the contract by accepting the Continental mortgage commitment, if it was still available, or a comparable commitment from any reliable lending institution, and by constructing in its shopping center, and leasing to Easton, a twin motion picture theatre building. This order was conditioned on Easton's filing, within sixty days of the date the decree nisi became final, complete plans and specifications for the construction of a standard twin theatre building. The building contemplated by such plans had to be of such design that it could have been constructed in 1972 for not more than $215,000 by reputable contractors. The Chancellor dismissed Easton's claim for loss of profits, and allocated all delay costs equally between the parties.

Both parties filed exceptions to the Chancellor's adjudication. On September 20, 1977, the lower court en banc affirmed and adopted as its own the Chancellor's adjudication, and entered a final order. On October 17, 1977, Easton filed with the Chancellor final plans and specifications in accordance with the decree nisi and final order. On October 20, Easton and Wells Fargo filed cross-appeals to this court. On November 30, Wells Fargo filed objections to the plans and specifications with the Chancellor. On April 27, 1978,

we remanded the case, pursuant to our powers under Pa.R. A.P. 1701(b)(5), for the limited purpose of allowing the Chancellor to take testimony and rule on Wells Fargo's objections to Easton's plans and specifications.[3] Testimony was taken, and on July 5, 1978, the Chancellor dismissed the objections and ordered Wells Fargo to commence construction of the theatre building within thirty days, unless it posted a supersedeas bond in the amount of $200,000. On October 17, the lower court en banc affirmed this order.

## —Wells Fargo's Appeal—

Wells Fargo argues that the Chancellor erred in ordering specific performance because 1) it was discharged from any duty to accept the Continental commitment since by the time that commitment was obtained, Easton had already committed various breaches of the lease, and 2) even if it was not so discharged, it did not commit a breach by rejecting the Continental commitment since the terms of that commitment contravened the terms of the lease.

In considering these arguments, we are guided by "the well-established rule that a chancellor's findings of fact, approved by a court en banc, have all the force and effect of a jury's verdict if they are supported by adequate evidence and ordinarily will not be disturbed on appeal. . . . However, the chancellor's 'conclusions, whether of law or ultimate fact are no more than his reasoning from the underlying facts and are reviewable.' " *Keyser v. Margolis,* 422 Pa. 553, 557, 223 A.2d 13, 15 (1966) (citation omitted). *See also Piercing Pagoda, Inc. v. Hoffner,* 465 Pa. 500, 513–14, 351 A.2d 207, 213 (1976); *Shydlinski v. Vogt,* 406 Pa. 534, 537, 179 A.2d 240, 241 (1962); *Sechler v. Sechler,* 403 Pa. 1, 4–5, 169 A.2d 78, 80 (1961).

## —1—

The Chancellor found that Easton was in fact the first party to breach the lease. He further found, however, that

**3.** We retained jurisdiction of the case, however, and oral argument was heard on June 15, 1978.

these breaches were not substantial enough to discharge Wells Fargo from its duty to perform according to the lease.

Whether a breach is so substantial as to justify an injured party's regarding the whole transaction as at an end "is a question of degree; and it must be answered by weighing the consequences in the light of the actual custom of men in the performance of contracts similar to the one that is involved in the specific case." 4 Corbin, Contracts, § 946 (1951). *See also* Restatement Second of Contracts § 266 (Tent. Draft No. 8, 1973) (setting forth factors to be considered in determining whether a breach is material); 17 Am.Jur.2d, *Contracts* § 504 (1964). Wells Fargo cites two breaches of the lease by Easton as substantial: Easton's failure to submit final plans and specification for the theatre building within sixty days of the execution of the amended lease on July 17; and its refusal to furnish Wells Fargo with financial information concerning its management and operations. These breaches, Wells Fargo argues, prevented it from exercising its contractual right to obtain mortgage financing for the venture. We agree with Wells Fargo that if Easton's breaches had this effect, they were so substantial as to justify Wells Fargo in regarding the whole transaction at an end. We must therefore consider what in fact was the effect of each of Easton's breaches.

Previous cases have held that when an agreement for the sale of realty is conditioned on the buyer's ability to secure a mortgage loan to cover the purchase price, the buyer will not be compelled to purchase if after making a good faith effort, he has been unable to obtain adequate financing. This is so even though at the time of settlement the seller is willing to extend a purchase money mortgage loan himself, for "the buyer [has] the right to seek his own mortgage, and he cannot be forced to go ahead with the purchase by having thrust upon him a type of financing which the sellers happen to think is reasonable." *Tieri v. Orbell*, 192 Pa.Super. 612, 616, 162 A.2d 248, 250 (1960). *Accord: In re King's Estate*, 183 Pa.Super. 190, 130 A.2d 245 (1957). *Cf. Robert F. Felte, Inc. v. White*, 451 Pa. 137, 302

A.2d 347 (1973);  *Hollander v. Friedman*, 360 Pa. 20, 59 A.2d 892 (1948).  Of course, the present case involves a lease rather than a sale of realty;  but this distinction is not legally significant.  Under the lease Wells Fargo had the right to try to obtain mortgage financing for the venture on its own terms;  until it had been accorded that right it was not required to accept financing secured by Easton.

Having said this, however, we are faced with the fact that Wells Fargo failed to prove that Easton's breach in failing to submit final plans and specifications did prevent it from exercising its right to try to obtain mortgage financing.  Wells Fargo argues that final plans and specifications are always required by a mortgage lender before the lender will commit itself to a construction loan.  Easton counter-argues that a mortgage lender normally will commit itself to a construction loan on the basis of only preliminary plans and specifications, of the kind it gave Wells Fargo before the execution of the amended lease.  It is unnecessary for us to resolve this factual dispute as to the practice of mortgage lenders, for under the terms of the lease the date Easton was required to submit final plans and specifications coincided with the last day Wells Fargo was given to obtain mortgage financing.  Thus, under the contract, as made by the parties, Wells Fargo was to try to obtain financing without the benefit of final plans and specifications, regardless of whether or not mortgage lenders usually require such before making a commitment.  When Easton breached the lease by failing to submit final plans and specifications by the sixtieth day following the execution of the lease, the responsibility for trying to obtain financing for the venture had already passed to it.[4]

Nor do we believe that Easton's failure to provide financial information prevented Wells Fargo from exercising its contractual right to try to obtain mortgage financing.

4.  Easton's duty to seek financing was conditioned on Wells Fargo's procurement of a subordination agreement from all ground mortgagees of the land on which the theatre building was to be built.  This condition is irrelevant to the present appeal.

The lease provided that to enable Wells Fargo to obtain mortgage financing, Easton was to give Wells Fargo information concerning its business operations.[5] In some circumstances, Easton's failure to comply with this provision might have discharged Wells Fargo from its duty to perform. The Chancellor found, however, and Wells Fargo does not dispute the finding, that although Wells Fargo made preliminary inquiries regarding the procurement of financing, it never submitted to any lender a written application for mortgage financing, and never received a written request for financial information on Easton.

Finally, we note that Wells Fargo had the burden of showing that Easton's breaches were so substantial as to justify it in regarding the whole transaction at an end. *Fritz v. Lyons*, 185 Pa.Super. 549, 138 A.2d 182 (1958); *Plank v. Schifter*, 85 F.Supp. 397 (E.D.Pa.1949); 5A Corbin, Contracts § 1228 (1964); 71 Am.Jur.2d, *Specific Performance* § 207 (1973). Given the terms of the lease and the Chancellor's undisputed findings, we cannot say that Wells Fargo carried its burden.[6]

5. Paragraph 3801 of the lease provided:
    To provide for . . . mortgage financing tenant [Easton] agrees to . . . furnish all information deemed necessary by the landlord [Wells Fargo] including, but [not?] limited to information regarding the type and ownership of tenant's business, tenant's capital structure, the management qualifications of tenant's operators . . . and certified copies of tenant's financial statements. Tenant further agrees to supply any and all additional information required by any mortgagee, financial institution or lease guarantee insurance company.

6. Wells Fargo has also argued that Easton's failure to submit final plans and specifications constituted a substantial breach because the plans were necessary to ensure that the quality and design of the theatre building would be consistent with the quality and design of the other buildings in the shopping center, and also to ensure that the theatre building would conform to township zoning and building codes. We agree with Wells Fargo that these are important concerns, and recognize that in some cases the failure to make a timely submission of plans and specifications will constitute a material breach. *See Levicoff v. Richard I. Rubin & Co.*, 413 Pa. 134, 196 A.2d 359 (1964); cf. *Associated Lathing & Plastering Co. v. Louis C. Dunn, Inc.*, 135 Cal.App.2d 40, 286 P.2d 825 (1955). Nevertheless, Wells Fargo has failed to show how it was prejudiced by Easton's

We now turn to Wells Fargo's argument that even if—as we have just held—it was not discharged from the lease by Easton's breaches, it nevertheless did not commit a breach by rejecting the Continental mortgage commitment.

■■ As noted above, under the terms of the lease Wells Fargo was only required to accept a mortgage loan that met the following conditions: The loan was to be "in the amount of Two Hundred Fifteen Thousand Dollars ($215,000) on terms of twenty (20) year payback with interest not to exceed 9½% and with the leased premises as the only security, provided no extreme conditions as to pre-payment of Landlord . . . ." Lease Addendum at 3. The Continental mortgage commitment was in the amount of $215,000 with an interest rate of 9½% and no extreme conditions as to prepayment. Wells Fargo argues, however, that the commitment still did not conform to the requirements in the lease because it 1) called for the assignment of the lease to Continental as security for the loan; 2) provided that Easton would make direct rental payments to Continental to cure any default by Wells Fargo of its obligations under the mortgage; 3) granted Easton and its assigns free and unrestricted ingress and egress to the shopping center; and 4) required Wells Fargo to sign a note for the loan. The validity of these objections turns upon the meaning of the requirement in the lease that the "leased premises" were to be the only security for the loan. Wells Fargo argues that the term "leased premises" meant that only the *land* on which the theatre building was to be erected was to be security for the loan, *i. e.*, in case of default, the lender could reach neither Wells Fargo nor the theatre building but would be confined to the land. Wells Fargo's Brief at 21. Easton argues that the term "leased premises" did "not

delay. Usually, time for performance is not regarded as an essential term in a contract, even though the time for performance may be fixed. *Tolan v. O'Malley*, 450 Pa. 214, 217–18, 299 A.2d 229, 230 (1973); *L. C. S. Colliery, Inc. v. Globe Coal Co.*, 369 Pa. 1, 84 A.2d 776 (1951); *Cochrane v. Szpakowski*, 355 Pa. 357, 49 A.2d 692 (1946); 6 Corbin, Contracts § 1258 (1962).

restrict or prevent the mortgagee from obtaining security with respect to each and every [one of Wells Fargo's rights] in and to the demised premises." Appellant's Reply Brief at 13.

In resolving the meaning of the term "leased premises," we concur with the Chancellor that the

contract should be construed in the light of its subject matter and conditions that existed when it was executed, and that in attempting to ascertain the true intent of the parties it is proper to consider the situation of the parties at the time the contract was made, as well as the necessities for which they provided, the advantages each probably sought to secure, and the objects they apparently had in view. *Tucker v. Fertig*, 275 Pa. 351, 119 A. 412 (1923); *Slonaker v. P. G. Publishing Co.*, 338 Pa. 292, 13 A.2d 48 (1940); *Foulke v. Miller*, 381 Pa. 587, 112 A.2d 124 (1955).

Record at 21a.

We believe that at the time the lease was executed, Wells Fargo intended to limit its risk in the venture by ensuring that none of its assets would be encumbered by a construction mortgage other than those assets that the construction loan would produce. Among the assets that the construction loan would produce were the theatre building and the lease of the building, for without a construction loan, the building would not be built and the lease between the parties would terminate.[7] Our belief that this was Wells Fargo's intent is strengthened by the Chancellor's finding, which Wells Fargo does not dispute, that "the Continental commitment [was] of a type that was usual and customary for a financial institution to issue prior to embarking on a venture in which large sums of money were to be expended." Record at 21a. As the Supreme Court stated in *Consolidated Tile and Slate Co. v. Fox*, 410 Pa. 336, 339, 189 A.2d 228, 229 (1963):

**7.** In addition, we believe that Wells Fargo contemplated at the time it signed the lease that assets integrally tied to assets produced by the construction loan, for example, the land under the theatre building, would also be subject to a mortgage.

[I]f the language of the contract is ambiguous and suscep-
tible of two interpretations, one of which makes it fair,
customary and such as prudent men would naturally exe-
cute, while the other makes it inequitable, unusual, or
such as reasonable men would not likely enter into, the
construction which makes it rational and probable must be
preferred  .  .  . .

See also RKO–Stanley Warner Theatres, Inc. v. Graziano,
467 Pa. 220, 355 A.2d 830 (1976); Restatement of Contracts
§ 248 (1932).  Since the Continental commitment was found
to be usual and customary, we must assume that it was the
kind of commitment that the parties, when they made this
contract and agreed to the term "leased premises," envi-
sioned Wells Fargo would accept.  Moreover, we note that
Continental's requirement that the lease be assigned to it as
security for its loan was no more than a requirement that
Wells Fargo recognize a right Continental would have en-
joyed at law even in the absence of a contractual assign-
ment.  See Metropolitan Life Ins. Co. v. Associated Auction-
eers, Inc., 117 Pa.Super. 242, 245, 177 A. 483, 484 (1935):
"Ordinarily, where there is a change in the ownership of the
reversion the new owner succeeds to the rights of the
lessor." Accord: National Forge Co. v. Carlson, 452 Pa.
516, 307 A.2d 902 (1973); Botnik v. Chapkis, 166 Pa.Super.
74, 70 A.2d 401 (1950).

Given our holding that the Continental commit-
ment did not contravene the terms of the lease by requiring
the assignment of the lease, Wells Fargo's remaining objec-
tions may be disposed of summarily.  Continental would
have been entitled to demand direct rental payments from
Easton to cure any default by Wells Fargo of its obligations
under the mortgage even in the absence of a mortgage
provision to that effect.  Peoples-Pittsburgh Trust Co. v.
Henshaw, 141 Pa.Super. 585, 15 A.2d 711 (1940).  As for the
requirement that Easton and its assigns be given free and
unrestricted ingress and egress to the shopping center, Ea-
ston already enjoyed those rights under Article II of the
lease.  Finally, we are willing to take notice of the fact that

it is an unusual financial arrangement where a mortgagor mortgages its property without assuming liability on a note for the underlying debt. Because the arrangement would be unusual, we shall not assume that the parties intended it here.[8]

—Easton's Appeal—

Easton argues that the Chancellor erred 1) in denying it damages for loss of profits, and 2) in dividing all additional construction costs caused by the delay equally between the parties.

—1—

The Chancellor dismissed Easton's claim for lost profits in one sentence, saying: "[W]e are unable to approve plaintiff's claim, as we feel that such an award . . . would be inequitable under the circumstances of this case." [9] Record at 25a. We agree with Easton that the Chancellor abused his discretion by dismissing its claim in such a manner.

■■■ We begin with the general proposition that "a court of equity follows and is bound by rules of law, and does not use equitable considerations to deprive a party of his rights

8. Wells Fargo has also argued that the Continental commitment provided only for permanent mortgage financing while the lease called for construction mortgage financing, and that even if the commitment provided for construction financing, the Chancellor was without power to order it to accept such financing from a lending institution not within the jurisdiction of the court. The short answer to these arguments is that they might have been made by Continental, but were not. The vice-chairman of Continental testified that the bank would have provided construction financing had Wells Fargo accepted the commitment, and had the parties desired it. The Chancellor gave this testimony full credit, and having done so was empowered to order Wells Fargo to accept the commitment. *See generally* 71 Am.Jur.2d, *Specific Performance* §§ 23, 61 (1973).

9. Although no cases were cited by the Chancellor to support his dismissal of this claim, cases were cited earlier in his opinion for the proposition that a court in equity has discretion to dismiss monetary claims according to the equities of the case. *See* footnote 10, *infra*, and accompanying text.

at law." *Bauer v. P. A. Cutri Co. of Bradford, Inc.*, 434 Pa. 305, 310, 253 A.2d 252, 255 (1969). *See also First Federal Savings & Loan Assoc. v. Swift*, 457 Pa. 206, 321 A.2d 895 (1974); *Abrahams v. Wilson*, 134 Pa.Super. 297, 3 A.2d 1016 (1939). We have held that where a landlord has wrongfully deprived its tenant of the beneficial use of a leasehold, the tenant is entitled to recover all losses flowing from the deprivation, including damages for loss of profits. *Pollock v. Morelli*, 245 Pa.Super. 388, 369 A.2d 458 (1976). This is so even though the tenant has been awarded specific performance of the lease, since "[s]pecific performance at the end of a protracted litigation and under compulsion is practically never full performance of the contract; instead, there has been an extensive and injurious partial breach. In such a case, the court should decree the payment of damages for the partial breach that has already occurred, even though obedience to the decree will prevent the commission of further breaches." 5A Corbin, Contracts § 1222 (1964). In cases where specific performance is granted of a contract to sell realty, the general rule "is that the vendor must account to the purchaser for any deprivation of the use of the property from the date when possession should have been transferred and for any detriment to the property caused by his failure to preserve it properly . . . . In addition, the vendor must compensate the purchaser for any special or consequential losses resulting from a default on his part to convey the property at the time specified . . . ." Annot., 7 A.L.R.2d 1204, 1206 (1949). *Accord*: *Leafgreen v. Drake's Exrs.*, 300 Pa. 369, 150 A.2d 656 (1930). *See also Patrick v. Wilkins Co. v. Adams*, 471 Pa. 63, 369 A.2d 1195 (1977); *Kreider v. Brubaker*, 371 Pa. 279, 89 A.2d 502 (1952); *Sladkin v. Greene*, 359 Pa. 528, 59 A.2d 105 (1948); 71 Am.Jur.2d, *Specific Performance* § 217 (1973). There is no basis for distinction between cases where specific performance is awarded of a contract to sell realty and a contract to lease realty. In both situations, the innocent party is entitled to recoup his losses.

The cases cited by the lower court in support of its holding that it had discretionary power to deny Easton damages for the losses it sustained as a result of Wells Fargo's breach are not contrary. *See Sigal v. Manufacturer's Light and Heat Co.*, 450 Pa. 228, 299 A.2d 646 (1973); *Township of Salisbury v. Vito*, 446 Pa. 200, 285 A.2d 529 (1971); *Dombroski v. City of Philadelphia*, 431 Pa. 199, 245 A.2d 238 (1968).[10] Those cases hold that a Chancellor has the power to shape relief according to the equities of the case under a plaintiff's prayer for general relief. However, the Chancellor's decision to grant or deny such additional relief must be founded on competent support in the record. Here the Chancellor dismissed Easton's prayer for consequential damages without regard to the merits of its claim on the ground that equities perceived but not identified by the Chancellor, called for dismissal. This was error. On remand the Chancellor should make findings of fact with accompanying conclusions of law. If these disclose that Easton has proved its claim for loss of profits, a proper award should be made. We realize that such an award, being incidental to a decree of specific performance, is not the same as legal damages. *See generally* Annot., 7 A.L.R.2d at 1206. Rather, a court in equity is involved in an accounting by which it fairly apportions between the parties the costs caused by the delay in the performance of the contract. In order to be fair, the accounting must assign those costs to the party responsible for them. A court does not have the discretion to apportion costs without regard to the parties' respective responsibility.

—2—

The Chancellor also erred in ruling that all construction costs caused by the delay in the construction of the theatre building should be borne equally by the parties. The Chancellor justified this allocation on the following grounds:

10. These cases were cited by the lower court in connection with Easton's claim for additional construction costs caused by the delay, but they clearly influenced the court's disposition of Easton's loss of profits claim as well.

Our review of the record convinces us that even had [Wells Fargo] timely accepted the Continental commitment, construction would have been thwarted by the lack of final plans and specifications. Under such circumstances, we are inclined to attribute the delay of the theatre's construction to both parties . . . .

Record at 24a.

We agree with the Chancellor that because Easton had not submitted final plans and specifications as of the date Wells Fargo breached the lease, Easton was responsible for part of the delay in the construction of the building. Easton's failure to submit plans before that date constituted a breach, and although, as we have held above, that breach was not substantial, Easton was nevertheless liable for all damages caused by it. *See* 5A Corbin, Contracts § 1176 (1964); Restatement of Contracts § 375(3) (1932). It does not follow from this proposition, however, that Easton is liable for one-half of the delay costs, and we are unable to determine why the Chancellor thought it was. The Chancellor entered his adjudication on June 7, 1977, slightly more than five years after Wells Fargo's breach in the spring of 1972. Thus, by splitting the delay costs equally, the Chancellor made Easton responsible for two and a half years of delay. There is no basis in the record for finding that Easton's failure to submit plans caused such a delay. On the other hand, there is substantial evidence that Easton could have furnished Wells Fargo with final plans and specifications within sixty days of Wells Fargo's acceptance of the Continental commitment. Indeed, following the entry of the final order by the court en banc, Easton was able to file final plans and specifications with the Chancellor within less than half that time.

Other courts have held in situations analogous to the present one that delay costs in construction contracts should be borne by the party at fault. *See Yonan v. Oak Park Federal Savings & Loan Assn.*, 27 Ill.App.3d 967, 326 N.E.2d 773 (1975); *Christensen v. Slawter*, 173 Cal.App.2d 325, 343 P.2d 341 (1959); *cf. Sayre Borough v. Waverly, Sayre &*

*Athens Traction Co.*, 270 Pa. 412, 113 A. 424 (1921) (defendant's financial embarrassment no excuse for not performing construction according to its contract). This rule should be applied here. When the parties entered into the lease in 1972, Easton bargained for a leasehold in a $215,000 building in Wells Fargo's shopping center. The building, though not yet constructed, was identified by the amount of investment Wells Fargo agreed to put into it, by preliminary drawings, and by its intended use. In return, Wells Fargo bargained for an annual rental of $31,800 plus 10% of Easton's gross receipts over $300,000. Because of Wells Fargo's breach, the building was still not constructed at the time of the Chancellor's adjudication, five years later. During this five year period construction costs rose dramatically, and the building that Wells Fargo could have built for $215,000 in 1972 could no longer be built for that amount. By splitting the delay costs equally, the Chancellor was in effect taking one half of the appreciation Easton would have enjoyed on its leasehold had Wells Fargo built the building in 1972 as it was obliged to do; for had Wells Fargo built the building in 1972, the value of the building in 1977 would have approximated the cost of a new theatre less depreciation. Easton, as a long-term lessee of the building, would have enjoyed most of that appreciation. In addition, the Chancellor was re-adjusting Easton's risks in the venture. In 1972, Easton undertook the obligation to pay $31,800 annual rent, but in return it received a leasehold that did not terminate until December 31, 1992.[11] Under the Chancellor's decree, Easton's risk, or investment, was increased by one half the delay costs. In return it received a leasehold with less than fourteen years to run. Indeed, under the Chancellor's decree it appears that Wells Fargo could receive a windfall on the value of its reversionary interest, since Easton is required to pay for part of the construction of the building yet is getting less of the building's useful life.

11. *See* Article IV of the lease. Easton also had options to extend the organization of the lease for two additional ten year periods.

On remand the Chancellor should determine the period of delay each party caused and allocate the delay costs accordingly. We realize that the effect of our decision is that Wells Fargo's risk in the venture will now be much greater. When the lease was executed, the minimum rental was set at a level such that Wells Fargo was assured of recouping its investment within a given number of years. Given the increased construction costs, it will now take Wells Fargo much longer to recover its money. Nevertheless, Wells Fargo, not Easton, was responsible for most of the delay that occurred; as the greater wrongdoer it must bear the greater loss.

Finally, we note that although Wells Fargo has not raised the claim that Easton should be denied specific performance because it had an adequate remedy at law, we have considered the issue, for a court may dismiss a complaint in equity on its own motion where it appears from the record that the plaintiff has an adequate remedy at law. *See Myshko v. Galenti,* 453 Pa. 412, 309 A.2d 729 (1973); *Carelli v. Lyter,* 430 Pa. 543, 244 A.2d 6 (1968); *Weaver v. Shenk,* 154 Pa. 206, 26 A. 811 (1893); *Appeal of Pittsburgh and Allegheny Drove Yard Co.,* 123 Pa. 250, 16 A. 625 (1889); Pa.R.C.P. 1509(c). We have concluded, however, that Easton's complaint should not be dismissed on this ground. In doing so, we are persuaded by the analysis set forth in 4 Pomeroy's Equity Jurisprudence §§ 1401–03 (5th ed. 1941), and by the application of that analysis by the United States District Court for the District of Columbia in a case similar to the present one, where the court said:

> "The foundation and measure of the jurisdiction is the desire to do justice, which the legal remedy would fail to give. * * *
>
> " * * * The jurisdiction depending upon this broad principle is exercised in two classes of cases: 1. Where the subject-matter of the contract is of such a special nature, or of such a peculiar value, that the damages, when ascertained according to legal rules, would not be a just and reasonable substitute for or representative of

that subject-matter in the hands of the party who is entitled to its benefit; or in other words, where the damages are *inadequate*; 2. Where, from some special and practical features or incidents of the contract inhering either in its subject matter, in its terms, or in the relations of the parties, it is impossible to arrive at a legal measure of damages at all, or at least with any sufficient degree of certainty, so that *no* real compensation can be obtained by means of an action at law; or in other words, where damages are *impracticable*."

It is apparent from the nature of the contract involved in this case that even were it possible to arrive at a precise measure of damages for breach of a contract to lease a store in a shopping center for a long period of years—which it is not—money damages would in no way compensate the plaintiff for loss of the right to participate in the shopping enter enterprise . . . .

*City Stores Co. v. Ammerman,* 266 F.Supp. 766, 776 (D.D. C.1967), *aff'd,* 129 U.S.App.D.C. 325, 394 F.2d 950 (1968).

*See also Grayson-Robinson Stores, Inc. v. Iris Construction Corp.,* 8 N.Y.2d 133, 202 N.Y.S.2d 303, 168 N.E.2d 377 (1960).[12] We do not imply that in all cases where a landlord has contracted to construct a building on its property, the landlord will be required to perform on the ground that interests in land are always specifically enforceable. If the record shows that at the time the landlord breached its contract, other properties were available to the tenant that offered business advantages comparable to those offered by the landlord's property—except for differences in rent and overhead costs for which an adequate remedy at law exists—a Chancellor might properly deny the tenant's prayer for specific performance. Such a denial might be particularly appropriate in a case where the tenant has failed to lease comparable property that he knew or should have known was available, and where the costs arising from the delay in

12. Our own Supreme Court, of course, has held that the owner of a shopping center may be ordered to specifically perform the terms of a lease that includes the promise to construct a building for a tenant. *See Goldman v. McShain,* 432 Pa. 61, 247 A.2d 455 (1968).

construction are such that the landlord will no longer get his part of the bargain if the lease is specifically enforced. A plaintiff seeking equitable relief must have acted in good faith; and if the court of equity finds that a tenant could have reasonably protected his interests but failed to do so, relief may be withheld. In the present case, however, the Chancellor made no such findings, and on appeal, Wells Fargo has not raised the issue of Easton's good faith.

The lower court's order holding Wells Fargo liable and ordering specific performance is affirmed; the lower court's order denying Easton monetary damages is reversed and the case is remanded for further proceedings consistent with this opinion.

JACOBS, former President Judge, and HOFFMAN, J., did not participate in the consideration or decision in this case.