

1999 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

3-11-1999

# Alghny Energy Inc v. DQE Inc

Precedential or Non-Precedential:

Docket 98-3586

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1999

Recommended Citation

"Alghny Energy Inc v. DQE Inc" (1999). *1999 Decisions.* Paper 61.
http://digitalcommons.law.villanova.edu/thirdcircuit_1999/61

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1999 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed March 11, 1999

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

NO. 98-3586

ALLEGHENY ENERGY, INC.
Appellant

v.

DQE, INC.
Appellee

On Appeal from the United States District Court
for the Western District of Pennsylvania
D.C. No. 98-CV-1639
District Judge: Hon. Robert J. Cindrich

Argued January 15, 1999

BEFORE: GREENBERG AND RENDELL, Circuit Judges
and POLLAK, District Judge*

(Filed: March 11, 1999)

D. Stuart Meiklejohn
John L. Hardiman (argued)
Fraser L. Hunter, Jr.
Timothy E. DiDomenico
Sullivan and Cromwell
125 Broad Street
New York, New York 10004

_____

*Honorable Louis H. Pollak, United States District Judge for the Eastern
District of Pennsylvania, sitting by designation.

William M. Wycoff
David E. White
Thorp, Reed & Armstrong
One Riverfront Center
Pittsburgh, PA 15222

 Attorneys for Appellant

Douglas M. Kraus (argued)
Seth M. Schwartz
Skadden, Arps, Slate, Meagher &
 Flom
919 Third Avenue
New York, New York 10022

Jennifer Wilson Hewitt
Doepken, Keevican & Weiss
58th floor, USX Tower
600 Grant Street
Pittsburgh, PA 15219

 Attorneys for Appellee

OPINION OF THE COURT

POLLAK, District Judge.

This is a diversity case in which an interlocutory appeal has been taken from the denial of a preliminary injunction. The appeal presents a question of Pennsylvania law. The question is whether, on the particular facts of this case, the loss by one publicly traded corporation of a contractual opportunity to acquire another publicly traded corporation through a corporate merger constitutes irreparable harm. In concluding that the plaintiff -- the would-be acquiring corporation -- was not entitled to a preliminary injunction compelling specific performance of the merger agreement, the district court ruled that if the plaintiff prevailed on the merits it would have an adequate remedy at law in the form of an action for damages. Plaintiff's contention that the loss of the numerous expected benefits of the merger was not quantifiable as damages, and hence constituted irreparable injury, was rejected by the district court. On this appeal,

2

plaintiff renews that contention. We conclude that, in the context of this case, plaintiff's contention is soundly based. Accordingly, we will vacate the judgment of the district court and remand for further proceedings.

I. Facts and Procedural History

Allegheny Energy, Inc. ("Allegheny")1 and DQE, Inc. ("DQE") -- both of which are utility companies whose shares are traded on the New York Stock Exchange -- entered into a merger agreement on April 7, 1997. The agreement envisioned a combined company in which DQE would be a wholly-owned subsidiary of Allegheny. Allegheny is a utility holding company that provides electricity generation, transmission and distribution, chiefly in Pennsylvania, Maryland and West Virginia; its principal operating subsidiary is West Penn, a franchised electric service provider in western Pennsylvania. DQE is also a utility holding company; its principal operating subsidiary is Duquesne, a franchised provider in western Pennsylvania.

The merger agreement describes the context in which the agreement was signed:

> The electric utility industry throughout the United States is in the early stages of dramatic changes that are intended to bring competition to what has been, since the electric industry's inception, a collection of regional monopolies. These changes have been brought about in part through the adoption of the Energy Policy Act of 1992 and through orders 888 and 889 of the FERC [Federal Energy Regulatory Commission]. In addition, in Pennsylvania, where DQE has all of its electric utility business and [Allegheny] has a

_____

1. Several of the documents in the appendix provided to this court identify Allegheny as "Allegheny Power Systems, Inc." or "APS". The Pennsylvania Public Utility Commission has noted that "APS has changed its name to Allegheny Energy, Inc." Order on Reconsideration, Pennsylvania Public Utility Commission Docket # A-110150F.0015 (July 23, 1998), at n.1. We have substituted "[Allegheny]" for "Allegheny Power Systems, Inc." or "APS" wherever we have cited documents employing the erstwhile corporate name or its acronym.

3

substantial portion of its electric utility business, the trend to bring about competition led to the enactment in late 1996 of the Electricity Generation Customer Choice and Competition Act, 66 Pa. Cons. Stat. S 2801 et seq. (the "Pennsylvania Restructuring Legislation"), which provides, among other things, for a phase in of competition for retail electric customers in Pennsylvania and an opportunity for recovery of certain capital costs ("stranded costs") incurred by utilities in a regulated environment that are not likely to be recoverable through prices charged in a competitive environment.

A81. The Pennsylvania Restructuring Legislation empowered the Pennsylvania Utilities Commission ("PUC") "to determine the level of transition of stranded costs for each electric utility and to provide a mechanism, the competitive transition charge, for recovery of an appropriate amount of such costs . . . ." 66 P.S.A. S 2802 (15) (1997).2

The Joint Proxy Statement prepared by Allegheny and DQE -- a statement sent to shareholders of both corporations prior to the shareholder votes of May, 1997 approving the merger agreement -- described several strategic benefits of the merger. In particular, the Joint Proxy Statement noted that the Allegheny Board of Directors had identified the following reasons for the merger:

> (i) the Merger would better position [Allegheny] to take advantage of changes in the electric utility industry by expanding its service territory and number of customers served by combining its existing service territories with DQE's contiguous service territories;

_____

2. The competitive transition charge ("CTC") -- intended to recompense utilities for "stranded costs" -- is paid by customers. In addition to allowing customers to purchase electricity from the generator of their choice and empowering the PUC to assess a CTC appropriate to each utility's stranded costs, the restructuring legislation requires utilities to "unbundle" their services. Before the restructuring legislation, the PUC set a single electric rate reflecting generation, transmission, and delivery of electricity; the restructuring legislation will eventually require all customers to pay two (unbundled) rates: a negotiated rate for electricity generation, and a set rate for electricity transmission and delivery.

4

(ii) [Allegheny] management has historically been better than its peer companies at managing electric generation, transmission and distribution and its belief that the Merger would permit the combined management to utilize this expertise over greater amounts of generation and distribution;

(iii) based upon reports from its outside advisors and [Allegheny] management and publicly available materials regarding DQE, DQE management has historically been better than its peer companies in developing unregulated businesses and the [Allegheny] Board's belief that the Merger would permit the combined management to utilize this expertise as a part of a bigger, financially stronger enterprise;

(iv) the terms of the recently enacted Pennsylvania restructuring legislation and the significant mitigation efforts already undertaken by DQE would permit DQE to recover such stranded costs associated with DQE's investment in the Nuclear Facilities as determined to be just and reasonable by the PAPUC; and

(v) the synergies estimated by the managements of [Allegheny] and DQE appear to be achievable.

A82. Similarly, the Joint Proxy Statement noted that the DQE Board of Directors had identified the following reasons for the merger:

(i) the Merger will allow the combined company to . . . have the critical mass necessary to compete in a deregulated utility environment;

(ii) the estimated synergies from the Merger should improve DQE's financial performance due to savings from the elimination of duplicate activities and by creating improved operating efficiencies and lower capital costs;

(iii) the Merger will permit stockholders of DQE to benefit from the combined company's ability to take advantage of future strategic opportunities and to reduce its exposure to changes in economic conditions in any segment of its business;

5

(iv) the combined service territories of DQE and [Allegheny] will be more geographically diverse than the service territory of DQE alone, reducing DQE's exposure to changes in economic competitive or climatic conditions as well as providing a larger regional platform from which to expand DQE's customer base;

(v) [Allegheny]'s winter-peaking, low-cost, efficient operations, and suburban and rural customer base, will complement DQE's summer-peaking operations and urban customer base;

(vi) DQE's current customers will receive a wider range of energy-related products and services; and

(vii) DQE's mix of regulated and unregulated energy products and services provides a strategic fit with [Allegheny]'s core businesses.

A83.

Section 6.1 of the merger agreement has provided rules for the period between the signing of the agreement and consummation of the merger -- a consummation contingent both on the stockholder approvals referred to above and on approvals by the relevant regulatory boards.3 Among the interim rules is a prohibition on any action "that would prevent the Merger from qualifying for `pooling of interests' accounting treatment." A31.4

_____

3. Section 6.1 states that each company must operate "in the ordinary and usual course" of business and "use its best efforts" to "preserve its business organization intact and maintain its existing relations and goodwill." Moreover, it generally prohibits either party from unilaterally repurchasing stock, encumbering assets, changing stock-based compensation plans, or changing any compensation and benefit plan. See A30-31.

4. Under certain circumstances, stock-for-stock mergers may be structured to take advantage of an accounting method-- pooling of interests accounting treatment -- that provides financial advantages to the newly combined company by permitting the absorbed corporation's assets to be recorded at book value. See Daniel W. Jones & Val R. Bitton, Accounting for Business Combinations, in D.R. Carmichael et al., ACCOUNTANTS' HANDBOOK 6.2-.3 (7th ed. 1991). Valuing the absorbed

Other agreement provisions allow either party to abort the agreement prior to consummation under certain conditions. Most prominent is Section 8.2(a), under which Allegheny and DQE each reserved the right to terminate the contract on October 5, 1998 in the event that the merger was not consummated by that date. However, under Section 8.2(a), the October 5, 1998 date is automatically moved forward six months, to April 5, 1999, if, on October 5, 1998, certain conditions have been met, among them that "each of the other conditions to the consummation of the Merger . . . has been satisfied or waived or can readily be satisfied . . . ." A42.5

_____

corporation's assets at book value permits two savings: the combined company avoids recording the absorbed corporation's goodwill and avoids recording the (often higher) fair market value of the absorbed corporation's assets. Charles H. Meyer, ACCOUNTING AND FINANCE FOR LAWYERS IN A NUTSHELL 311-13 (1995). The combined company is thus freed from the requirement of amortizing the greater costs against its earnings over the ensuing years. Id. A combined corporation emerging from a merger accounted for under the pooling of interests method therefore would report higher annual earnings than the same corporation emerging from a merger accounted for under the traditional purchase method. Id.

In order to qualify for pooling of interests accounting treatment, a merger must meet several conditions. Those requirements fall into three groups: (1) characteristics of the combining companies; (2) manner of the combination; and (3) absence of pre- and post-combination transactions. Accounting Principles Board Opinion No. 16, "Business Combinations" (1970). See also generally AICPA Accounting Interpretations of APB Opinion No. 16. The third group of requirements is at issue in this case. The APB Opinion and Interpretations identify a number of actions that can frustrate pooling of interests accounting treatment if taken after the signing of a merger agreement and before consummation of the merger. Many of those actions can be taken unilaterally, and several -- such as a new stock award plan for officers and directors-- can occur without prior public announcement.

5. Section 8.1 permits termination by mutual written consent of both boards of directors. Section 8.3 permits Allegheny to terminate the agreement under certain circumstances, including a material breach by DQE that cannot be cured within thirty days. Section 8.4 permits DQE to terminate the agreement under certain circumstances, including a material breach by Allegheny that cannot be cured within thirty days. A42.

On August 1, 1997 (about four months after the merger agreement was signed), pursuant to the Pennsylvania restructuring legislation, Duquesne and West Penn-- the parties' major operating subsidiaries -- eachfiled restructuring plans with the PUC, and the two filed joint applications for PUC and Federal Energy Regulatory Commission ("FERC") approval of the merger. Almost eight months later, on March 25, 1998, PUC administrative law judges issued recommendations in the Duquesne and West Penn restructuring cases. On May 29, 1998, the PUC modified the administrative law judges' recommendations in the two cases. West Penn was disallowed approximately $1 billion of the $1.6 billion in allegedly stranded costs that it had requested.6

In a July 23, 1998 Order, the PUC held that the merged company would have to prove that it had mitigated its market power at a market power hearing to be held in the year 2000. Should the merged company fail at that time to establish that it had mitigated its market power, the PUC would order it to divest itself of 2500 megawatts of generation by July 1, 2000. Order on Reconsideration, Pennsylvania Public Utility Commission Docket # A-110150F.0015 (July 23, 1998), at 10.

The FERC -- which like the PUC has jurisdiction over market power issues -- also found certain elements of the parties' joint proposal related to market power to be inadequate. On September 16, 1998, the FERC ordered the companies either to divest DQE's Cheswick plant prior to the merger or to submit to a hearing on market power mitigation. A329.

DQE was concerned with what it viewed as the "material adverse effects" of the PUC Order in the West Penn case, the PUC market power order, and the FERC market power order. On October 5, 1998, DQE informed Allegheny that, pursuant to Section 8.2(a) of the merger agreement, it was terminating the agreement.7 Allegheny immediately filed a

_____

6. See note 2, supra.

7. As noted in text and footnote at note 5, supra, Section 8.2(a) authorized either party to terminate the agreement if the merger was not

complaint in the United States District Court for the
Western District of Pennsylvania, seeking specific
performance of the merger agreement, and -- fearing that
DQE would take action to scuttle pooling of interests
accounting treatment -- filed an accompanying motion
seeking both a temporary restraining order and a
preliminary injunction "enjoining DQE from taking any
action that it is precluded from taking without Allegheny's
consent under Section 6.1 of the Merger Agreement" until
Allegheny's claim for specific performance was decided.
A401.

The District Court heard argument on the motion on
October 5 and October 26. After considering testimony and
certain affidavits, the District Court denied both the
temporary restraining order and the preliminary injunction.
The District Court began its analysis by observing that
Allegheny had presented "persuasive" arguments that it had
a reasonable likelihood of success on the merits of its claim
that it was entitled to specific performance. Order at 3. The
court then turned to the question whether Allegheny had
demonstrated that it would suffer irreparable harm absent

---

consummated by October 5, 1998, but also made provision for automatic
extension of the October date to April 5, 1999. Section 8.2(a) required
that the October 5, 1998 deadline be automatically extended to April 5,
1999 if certain conditions were met, among them that"(ii) each of the
other conditions to the consummation of the Merger set forth in Article
VII has been satisfied or waived or can readily be satisfied." A42. DQE
asserted that Allegheny triggered DQE's Section 8.2(a) termination right
by failing to meet Section 7.3(a), one of the consummation conditions set
forth in Article VII. Section 7.3(a) conditions the merger on the fact
that
all "representations and warranties . . . set forth in this Agreement
shall
be true and correct as of the date of this Agreement and as of the
Closing Date . . . ." A41. DQE claims that Allegheny failed to meet
Section 7.3(a) because one of its representations or warranties, Section
5.1(f), was no longer true. Section 5.1(f) states that "since the Audit
Date
. . . there has not been (i) any change in the financial condition,
properties, business or results of operations . . .[or] developments
affecting it of which its management has knowledge that . . . is
reasonably likely to have a Material Adverse Effect on it . . . ." A23. In
DQE's view, the regulatory rulings were likely to have a material adverse
effect on Allegheny's business.

9

the injunction. The court thought damages would be an adequate legal remedy for breach of the merger agreement because "[b]usiness valuation experts are routinely called upon to value business mergers." Accordingly, the court concluded that not granting the requested preliminary injunction would not cause Allegheny irreparable injury. Id. at 4. The court further found that granting an injunction would entail "the possibility of harm to DQE." Id. at 5. Finally, the court found that the public interest "weighs substantially against the granting of injunctive relief" primarily for two reasons: (a) the court believed it would have "to become involved in the business affairs" of the parties and; (b) the court believed that "unintended collision with regulatory agencies and their statutory mandates" loomed as a possibility. Id. at 5-6. Allegheny appealed under 28 U.S.C. S 1292(a)(1).

II. Preliminary Injunction Standard

"Four factors," as we have recently had occasion to observe,

> govern a district court's decision whether to issue a preliminary injunction: (1) whether the movant has shown a reasonable probability of success on the merits; (2) whether the movant will be irreparably injured by denial of the relief; (3) whether granting preliminary relief will result in even greater harm to the nonmoving party; and (4) whether granting the preliminary relief will be in the public interest.

American Civil Liberties Union of New Jersey v. Black Horse Pike Regional Bd. of Educ., 84 F.3d 1471, 1477 n.2 (3d Cir. 1996) (en banc). See also Council of Alternative Political Parties v. Hooks, 121 F.3d 876, 879 (3d Cir. 1997). A district court should endeavor to "balance[ ] these four . . . factors to determine if an injunction should issue." American Civil Liberties Union of New Jersey, 84 F.3d at 1477 n.2.

Our review of a district court's denial of a preliminary injunction is limited to determining "whether there has been `an abuse of discretion, a clear error of law, or a clear mistake on the facts.' " McKeesport Hosp. v. Accreditation

10

Council for Graduate Med. Educ., 24 F.3d 519, 523 (3d Cir. 1994) (citing Hoxworth v. Blinder, Robinson & Co., 903 F.2d 186, 198 (3d Cir. 1990)).

III. Specific Performance and Irreparable Harm

A. Choice of Law

This diversity case is governed by Pennsylvania law. In their merger agreement, the parties agreed that "this agreement shall be deemed to be made in, and in all respects shall be interpreted, construed and governed by and in accordance with the law of, the Commonwealth of Pennsylvania without regard to the conflict of law principles thereof." A45 (complete capitalization omitted). The parties' contractual choice of law does not appear arbitrary: one of the two parties is a Pennsylvania corporation, and Pennsylvania is the state in which the parties' chief subsidiaries -- West Penn and Duquesne -- conduct their principal operations.8

Notwithstanding that Pennsylvania law governs this case, the briefs on appeal and the oral arguments before this court have not focused on Pennsylvania cases, presumably for the reason that counsel for both parties have found the case law from other jurisdictions to touch more closely than the Pennsylvania cases on the particular factual scenario presented by this litigation. We too have found no Pennsylvania cases that closely mirror the dispute between Allegheny and DQE. But our review of the pertinent Pennsylvania cases persuades us that the dispute at bar may be properly addressed within the general framework of those cases -- resting as they do on broadly familiar principles. And so, in the discussion which follows, we commence our analysis with those Pennsylvania cases. We

_____

8. Had the parties not stipulated that their agreement is to be governed by Pennsylvania law "without regard to the conflict of law principles thereof," the Erie doctrine would have required the application of Pennsylvania law, Erie R. Co. v. Tompkins, 304 U.S. 34 (1938), but with the inclusion of Pennsylvania conflict of laws principles. Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 496 (1941).

11

then turn to consider the pertinent case law on which the parties have chiefly relied -- i.e., case law from other jurisdictions: taken as a whole, those cases -- some of which are, indeed, factually more akin to the present dispute than the Pennsylvania cases -- build upon the broad foundational principles that inform the Pennsylvania cases. We feel comfortable in concluding, therefore, that lessons drawn from non-Pennsylvania cases have proper application to the Pennsylvania dispute before the court.

We begin with a consideration of the law of specific performance -- in Pennsylvania first, and then more broadly. After addressing the question whether specific performance would be the appropriate remedy for the breach of contract alleged in this case, we inquire whether an affirmative answer to that question mandates afinding of irreparable harm.

B. Specific Performance

i.

Allegheny argues that it is entitled to specific performance -- not just money damages -- because of "the inherent uniqueness of a company sought to be acquired, and the irreparable harm suffered by the party acquiring the company by the loss of the opportunity to own or control that business." Pl. Br. at 22 (citing Peabody Holding Co., Inc. v. Costain Group PLC, 813 F. Supp. 1402, 1421 (E.D. Mo. 1993)). DQE disagrees, arguing that corporate combinations are regularly valued.

Pennsylvania law conforms to the general rules regarding the availability of specific performance. "Specific performance should only be granted . . . where no adequate remedy at law exists." Clark v. Pennsylvania State Police, 436 A.2d 1383, 1385 (Pa. 1981) (citing Roth v. Hartl, 75 A.2d 583 (Pa. 1970)). "Equitable jurisdiction to grant specific performance," the Pennsylvania Supreme Court observed in 1986, "depends upon the `inadequacy' of the remedy at law." Petry v. Tanglwood Lakes, Inc., 522 A.2d 1053, 1056 (Pa. 1986). Seventy years earlier the court had stated the principle in the following terms: "The mere fact

12

that a remedy at law exists is not sufficient to oust equitable jurisdiction; the question is whether the remedy is adequate or complete." Edison Illuminating Co. v. Eastern Pa. Power Co., 98 A. 652, 655 (Pa. 1916). With respect to what constitutes an adequate remedy at law, the Pennsylvania Supreme Court has observed that "[a]n action for damages is an inadequate remedy when there is no method by which the amount of damages can be accurately computed or ascertained." Clark, 436 A.2d at 1385 (citing Strank v. Mercy Hospital of Johnstown, 117 A.2d 697 (Pa. 1955)). Damages cannot be accurately ascertained"where the subject matter of an agreement is an asset that is unique or one such that its equivalent cannot be purchased on the open market." Tomb v. Lavalle, 444 A.2d 666, 668 (Pa. Super. Ct. 1981).9

These general rules are unremarkable. But the parties have not cited, nor has our research disclosed, any published Pennsylvania opinion discussing the applicability of these general rules to a situation presenting the same characteristics as the case at bar -- i.e., a dispute arising out of the alleged breach of a merger agreement between two publicly traded companies. Accordingly, we look for guidance to the handful of Pennsylvania cases in which the general rules have been applied to closely cognate situations: broken agreements for the acquisition of an existing business or the development of a business opportunity.

In Cochrane v. Szpakowski, 49 A.2d 692 (Pa. 1946), the court upheld an award of specific performance of a contract for the sale of a restaurant and liquor business, finding that "a similar restaurant and liquor business to the one in question could not be purchased in the market, and therefore could not be reproduced by money damages." Id. at 361. "In this connection," the court continued,

> the learned chancellor properly said: `The contract
> involved here is one for the sale of a certain restaurant

_____

9. A good need not be inherently unique; it may become unique by virtue of its context. See Unatin 7-Up Co., Inc. v. Solomon, 39 A.2d 835 (Pa. 1944) (impossible to value access to sugar or machinery for the manufacture of soft drinks during wartime quota system).

and liquor dispensing establishment at a definite location, and the possession of the premises on which the same is located. There are no other premises nor is there any other restaurant which is exactly like the one involved here, and it would, for all practical purpose, be impossible for . . . [appellee] to prove what money he would lose if . . . [appellant] were permitted to breach this contract . . . .

Id. at 361–62 (ellipses and bracketed terms in original).

In Easton Theaters, Inc. v. Wells Fargo Land and Mortgage Co., Inc., 401 A.2d 1333 (Pa. Super. 1979), a lessee sought specific performance of a landlord's agreement to build a movie theater for it on property adjacent to the landlord's shopping center. The Superior Court found that future profits would be impossible to calculate accurately and that the landlord had not shown that similar substitute properties were available to the lessee. Accordingly, the court affirmed the trial court's order of specific performance. The Supreme Court appears to have approved the reasoning of Easton Theaters in Petry v. Tanglwood Lakes, Inc., 522 A.2d 1053 (Pa. 1986). In Petry, the court affirmed the denial of a plaintiff's claim for specific performance of a developer's contractual promise to build a lake adjacent to plaintiff's property.10 Finding that "damages here can be readily computed or ascertained," 522 A.2d at 1056, the court noted that:

This case is not similar to Goldman v. McShain, 432 Pa. 61, 247 A.2d 455 (1968), where a theater operator was permitted to sue a landowner and builder for specific

_____

10. It did so because, inter alia, the local condominium association had entered into a settlement with the developer requiring him to develop a recreational area on the site of the unbuilt lake. Thus, "[s]pecific enforcement of the covenant or building contract here at issue impinges on the rights and interests of other lot owners . . . . it is difficult to see how a purchaser in a condominium, or in a common development such as this, can reasonably argue that he or she purchased relying on, or is entitled to insist on, the absolute right to enforce specifically all executory agreements and promises originally made pertaining to the development, regardless of the wishes and rights of a majority of the other owners." 522 A.2d at 1057.

14

performance of a contract for the erection and operation of a theater. In that sort of case, involving what essentially amounts to a joint business venture, future business profits are of necessity speculative and difficult to determine.

In a footnote, the court acknowledged that its lost profits

point is not discussed directly in Goldman, but see Easton Theaters, Inc., v. Wells Fargo Land and Mortgage Co., Inc., 235 Pa. Superior Ct. 334, 401 A.2d 1333 (1979), where a lessee sought to compel a landlord, by specific performance, to build a theater on its (the landlord's) shopping center property. Superior Court thought that the agreement was specifically enforceable, not only because future profits would be impossible to calculate accurately, but also because the landlord had not shown that other similar properties would be available to the lessee as a substitute.

Id. at 1056 n.7.11

_____

11. In our court, the most analogous Pennsylvania case arose in a setting that was the obverse of the case at bar, in the sense that the plaintiff seeking injunctive relief was the prospective seller who sought to compel specific performance of an agreement to purchase plaintiff's business that the buyer had declined to consummate. The District Court had found that the buyer's principal purpose in acquiring the company was to obtain certain of the trucking company's regulated transportation rights. Determining that " `an award of damages would be inappropriate because it would be very difficult to determine the value' " of the regulated transportation rights, this court upheld the District Court's grant of specific performance. Kroblin Refrigerated Xpress, Inc. v. Pitterich, 805 F.2d 96, 103–04 (3d Cir. 1986) (citing district court slip opinion at 43). Cf. Girard Bank v. John Hancock Mutual Life Ins. Co., 524 F. Supp. 884, 895, 896 (E.D. Pa. 1981), aff'd, 688 F.2d 820 (3d Cir. 1982) (unpublished) (ordering specific performance of agreement in which insurance companies were to pay Girard in exchange for turning over security interests in boxcars on ground that measuring damages would be impossible because "[a]ny calculation of damages would require a complex inquiry into an assessment of the depreciated value of the boxcars, the changes in market price, the individual conditions of the boxcars, the adjustments for costs and expenses incurred during the management of the boxcars, as well as an accounting for the gross and net earnings of each boxcar.").

ii.

We turn now to a review of cases from other jurisdictions. In C&S/Sovran Corp. v. First Fed. Savings Bank of Brunswick, 463 S.E.2d 892 (Ga. 1995), First Federal and C&S/Sovran -- banks whose shares were publicly traded -- had executed an agreement by which First Federal would be merged into C&S/Sovran in exchange for shares of C&S/Sovran stock. Three days before the deadline for consummation of the merger, First Federal filed suit in state court seeking specific performance and damages for breach of contract. Following trial, a jury found that C&S/Sovran had breached the merger agreement. C&S/Sovran moved for post-trial summary judgment on First Federal's specific performance claim, but the court denied the motion and "ordered C&S/Sovran to prepare and file all applications with Federal and State regulatory authorities necessary to accomplish the merger," as well as to take other steps necessary to consummate the merger. Id. at 894. The Supreme Court of Georgia upheld the order of specific performance.

C&S/Sovran is the only opinion cited by counsel, or found by this court, which has addressed the applicability of the general rules of specific performance to a dispute arising out of the alleged breach of a merger agreement between two publicly traded companies. A number of other opinions, however, have considered grants of specific performance in cases falling within the broader category of broken agreements for the acquisition of an existing business or the development of a business opportunity. The First Circuit, applying Maine law, has upheld a grant of specific performance in the context of a buyer's claim arising from a breached contract for the sale of a minor league baseball franchise. Triple-A Baseball Club Assocs. v. Northeastern Baseball, Inc., 832 F.2d 214 (1st Cir. 1987). Speaking through Judge Bownes, the First Circuit noted that every court inside or outside of Maine to have addressed the issue of a breach of contract to sell a franchise had concluded that specific performance was an appropriate remedy. Id. at 223. Finding that a baseball franchise was a unique business, id. at 224, and that measuring lost profits would be difficult, id. at 225, the

16

court reversed the district court and remanded the case for the entry of a decree of specific performance ordering the sale, id. at 228. See also Wooster Republican Printing Co. v. Channel 17, Inc., 533 F. Supp. 601, 621 (W.D. Mo. 1981) (applying Missouri law and ordering specific performance of breached contract to sell television station from one closely held corporation to another after finding that television station was "unique").12

The Seventh Circuit read Illinois law in like fashion in Medcom Holding Co. v. Baxter Travenol Laboratories, Inc., 984 F.2d 223 (7th Cir. 1993). Considering an appeal from a district court order that a seller convey all of the shares in a wholly-owned subsidiary to a buyer that had contracted for them, the court noted that "a contract for the sale of corporate stock not publicly traded can be specifically enforced on the ground that valuation is imprecise without an active market for the stock. Furthermore, specific performance is also appropriate for breach of a contract to sell a business because a business is a unique asset." Id. at 227.13

_____

12. The court found the television station unique on the basis of expert testimony at trial, which established that the station "presents an unusual potential for future growth in a stable and growing market. Because of its potential for expansion with proper management and infusion of capital, its relative position in the local and national markets,
its network affiliation, its licensing and frequency, and its physical assets, among other things, Channel Seventeen is unique." Wooster Republican Printing Co., 533 F.Supp. at 621. See also Peabody Holding Co., Inc. v. Costain Group PLC, 813 F. Supp. 1402, 1421 (E.D. Mo. 1993) (granting injunction to block sale of business to third party that would have breached contract to sell business to plaintiff because: (1) agreement "expressly acknowledged `irreparable damage' to Peabody in the event of breach" (2) Costain's "coal businesses are unique, including the management contracts and equity interests in existing and potential mining properties" (3) breach of contract to sell business does irreparable harm to frustrated buyer by virtue of "loss of the opportunity to own or control that business.").

13. The court turned from its general statement that "a business is a unique asset" to a description of the ways in which the subsidiary was unique: the plaintiff's "founder . . . is in the business of purchasing companies in order to `turn them around.' He purchased Medcom even though it had been losing money for several years. In purchasing

17

The Delaware Court of Chancery has engaged in a similar analysis. In True North Comm., Inc. v. Publicis, S.A., 711 A.2d 34, 44–45 (Del. Ch. 1997), aff'd, 705 A.2d 244 (Del. 1997), the court considered a controversy arising out of a soured joint venture agreement. Seeking to disentangle themselves, the two corporations that had entered into the joint venture agreement signed a subsequent agreement requiring each to assist its former partner in qualifying for pooling of interests accounting treatment in the event that the other sought to merge with a third party. When True North attempted to acquire a third party and to do so via pooling of interests, Publicis failed to provide the promised support. In concluding that specific performance was appropriate, the court noted that the dissolution agreement stipulated that injunctive relief would be available in the case of a breach. "Even without the contract language conceding the irreparable nature of the injury," the court continued, "it is nevertheless clear that True North will suffer irreparable harm if Publicis is not enjoined" because "Publicis' opposition efforts threaten to destroy the [third party] merger, which is a unique acquisition opportunity for True North." Id. at 44–45.14

_____

businesses, Manley looked for the right `building blocks.' Without all the blocks, it is conceivable that the chances of a successful `turnaround' might be lowered. [The subsidiary] could well be one of those building blocks necessary to turn Medcom around." Medcom Holding Co, 984 F.2d at 227 (deposition citations omitted).

14. The court did not explain why it deemed the enterprise True North was to acquire to be "a unique acquisition opportunity," but it did characterize that enterprise as "an international communications company with advertising and public relations agencies . . . around the world." Id. at 37.

Courts have found specific performance appropriate where a buyer has been frustrated in attempting to exercise a contractual right to purchase or maintain a controlling (or even significant but non-controlling) interest in an enterprise. See Baggett v. Cyclopss Med. Sys., Inc., 935 P.2d 1265, 1271 (Utah Ct. App. 1997), cert. denied, 940 P.2d 1224 (Utah 1997) (plaintiffs "view the shares as a means of control or influence over [the business], and not merely as instruments of financial investment"); King v. Stevenson, 445 F.2d 565, 572 (7th Cir. 1971) (affirming specific

18

These cases could be interpreted as imposing upon a plaintiff (the would-be acquirer) the burden of showing with some particularity that the business to be acquired is either inherently unique or offers a unique opportunity to the buyer. However, the cases go into little detail chronicling the attributes of uniqueness. Moreover, no case that has come to our attention has found a business either not unique or not offering a unique opportunity to the buyer. This militates against treating the plaintiff 's burden as an onerous one. We turn now to the question whether, in the case at bar, Allegheny has met that burden.

iii.

We think it clear that the agreed-upon Allegheny-DQE merger constitutes a unique, non-replicable business opportunity for Allegheny. The Joint Proxy Statementfiled with the SEC and mailed to both corporations' shareholders describes several respects in which the integration of DQE and Allegheny could be expected to produce particular benefits: the contiguity of Allegheny's and DQE's service territories; DQE's particular expertise -- "better than its peer companies" -- in "developing unregulated businesses"; the complementarity of Allegheny's "winter-peaking, low-cost, efficient operations, and suburban and rural customer base" with DQE's "summer-peaking operations and urban customer base"; the "strategic fit" of DQE's "regulated and unregulated energy products and services" and Allegheny's "core businesses"; "the combined company's ability to take advantage of future strategic opportunities and to reduce its exposure to changes in economic conditions in any segment of its business"; and the expectation that the

_____

performance of stock option agreement permitting majority shareholder to purchase shares from minority shareholder because "this block of stock was sufficiently important to [plaintiff] as president and developer"
of company). Cf. Mid-Continent Tel. Corp. v. Home Tel. Co., 319 F. Supp. 1176, 1197 (N.D. Miss. 1970) (specific performance inappropriate where decree would not be sufficiently "definite and workable" despite general state rule that "[s]pecific performance is an ordinary remedy for breach of contract to convey corporate shares where the shares may constitute a controlling interest in a unique corporation").

"combined company [would] . . . have the critical mass necessary to compete in a deregulated utility environment." In the measured prose of the Joint Proxy Statement, "the synergies estimated by the managements of [Allegheny] and DQE appear to be achievable." DQE has not undertaken to identify any available merger partner, other than itself, whose acquisition by Allegheny would yield even one, let alone all, of these very considerable business opportunities. Accordingly, if DQE has breached the merger agreement, Allegheny is entitled to specific performance.

C. The Relationship Between Specific Perform ance and Irreparable Harm

We now turn to a consideration of the harm that could befall Allegheny if a preliminary injunction were denied and DQE were to take any action destroying the possibility that the accounting aspects of the merger could be achieved pursuant to pooling of interests accounting. If the loss of pooling accounting were to block the ultimate consummation of the merger, Allegheny would suffer irreparable harm from the loss of the opportunity to control DQE. As the specific performance inquiry has shown, that loss could not be adequately recompensed through monetary damages.

If the merger is consummated despite the loss of pooling of interests accounting, Allegheny would suffer irreparable harm because DQE –- by then a part of Allegheny–- would no longer be able to recompense Allegheny for the difference between the value of the merger under pooling of interests accounting and the value of the merger under purchase accounting. DQE contends that the loss of pooling of interests accounting treatment would not be irreparable because the District Court could recompense Allegheny for any economic losses it suffered from loss of pooling of interests accounting treatment by adjusting the merger exchange ratio to give Allegheny's shareholders a greater share of ownership of the combined company. Because the loss of pooling of interests accounting treatment triggers losses that are themselves economic in nature and susceptible to financial valuation, DQE argues, DQE shareholders could fully recompense Allegheny for DQE's

breach by giving Allegheny a greater share of the combined company, thus vitiating the irreparable nature of the harm. However, Pennsylvania's Business Corporation Law does not permit changes in the consideration for a merger, once shareholder approval has been given, without a new shareholder vote. 15 P.S.A. S 1922 (b) states in relevant part that:

> A plan of merger or consolidation may contain a provision that the boards of directors of the constituent corporations may amend the plan at any time prior to its effective date, except that an amendment made subsequent to the adoption of the plan by the shareholders of any constituent corporation shall not change: (1) The amount or kind of shares, obligations, cash, property or rights to be received in exchange for or on conversion of all or any of the shares of the constituent corporation.

Section 1922(b) constitutes one of the "rules of decision" guiding this court sitting in diversity. 28 U.S.C. S 1652. Erie R. Co. v. Tompkins, 304 U.S. 64 (1938).

D. DQE's Arguments Against Irreparable Harm Under These Facts

DQE offers several reasons why its alleged breach should not give rise to Allegheny's requested specific performance or, if specific performance is appropriate, why the District Court was nevertheless correct in determining that Allegheny would not suffer irreparable harm if the preliminary injunction is denied. DQE's principal arguments are as follows:

(i) DQE argues that "injunctive relief . . . has only been granted in a corporate merger case where either (1) the contract contains an express provision reciting that damages would not be an adequate remedy for a breach and permitting the parties to seek injunctive relief and specific performance, or (2) the `target' company is non-public or closely-held thereby rendering it difficult to value." Def. Br. at 17-18 (emphasis in original). However, DQE cites no case holding -- or even stating in dictum -- that specific performance is not available unless the merger

21

contains an express provision permitting the parties to seek specific performance or the target is "non-public or closely-held." DQE's assertion that no such case has granted specific performance is thus no more than an assertion that no such case has yet arisen. It may be sufficient, for the purposes of the irreparable harm inquiry, that there is a contractual provision permitting specific performance15 or that a target is "non-public or closely-held," but the Pennsylvania Supreme Court has never held either to be a necessary predicate to irreparable harm. We see no ground for supposing that the Commonwealth's highest court would craft such a rigid rule.

(ii) DQE points to Section 8.5(b) of the merger agreement, which provides Allegheny with a merger termination fee not to exceed $50 million in the event that DQE terminates the contract in order to accept a better offer. See A43-44. DQE notes that "this provision is admittedly not triggered by a breach or other termination," but argues that the provision "reflects Allegheny's agreement and understanding that any `injury' stemming from its loss of the opportunity to merge with DQE may adequately be compensated through the payment of money." Def. Br. at 24. Pennsylvania law forecloses the argument that this provision of its own force precludes specific performance. As the Pennsylvania Supreme Court has stated, the presence of a liquidated damages provision in a contract "will not restrict the remedy thereto [i.e., to liquidated damages] or bar specific performance unless the language of the part of the agreement in question, or of the entire agreement . . . shows a contrary intent." Roth v. Hartl, 75 A.2d 583, 586 (Pa. 1950).16   Section 8.5(b) speaks
_____

15. Cf. True North Comm., Inc., v. Publicis, S.A., 711 A.2d 34, 44-45 (Del.
Ch.), aff'd, 705 A.2d 244 (Del. 1997) ("Even without the contract language conceding irreparable injury . . . it is nonetheless clear that True North will suffer irreparable harm if Publicis is not enjoined from pursuing its activities in opposition to the merger.").

16. Peabody Holding Co., Inc. v. Costain Group P.L.C., 813 F. Supp. 1402, 1421 (E.D. Mo. 1993) is also instructive:

        Defendants argue, however, that the $5 million liquidated damages
        provision . . . provides a reasonable estimate of the damages

22

only to the termination fee payable upon the unsolicited receipt of a superior merger offer. See A43. It states that "In the event that this Agreement is terminated (x ) by the Company pursuant to Section 8.3(a) (or 6.2), or (y) by Parent pursuant to Section 8.4(b)(i) or (iii), or (z) by the Company or Parent pursuant to Section 8.2(d), then the Company" shall pay a termination fee not to exceed $50 million. A43. Section 8.3(a) states that "This Agreement may be terminated and the Merger may be abandoned at any time prior to the Effective Time, whether before or after the approval by stockholders of the Company . . . by action of the board of directors of the Company: (a) subject to and in accordance with the provisions of Section 6.2;" A42. Section 6.2 concerns acquisition proposals by third parties. A32–33. Likewise, Section 8.4(b)(i) states that "This Agreement may be terminated and the Merger may be abandoned at any time prior to the Effective Time, before or after the approval by stockholders of Parent . . . by action of the board of directors of Parent: (a) subject to and in accordance with the provisions of Section 6.2 . . . ." A43. We do not read Section 8.5(b) -- which governs the fee payable upon a termination of the merger agreement arising from an unsolicited receipt of a superior merger offer -- to evince an intent to bar specific performance for

_____

> Peabody would suffer. The Court disagrees with defendants. It is clear, plainly on the face of S4.1(d) of the [stock purchase agreement], that the liquidated damages provision applies only to situations where no sale is consummated between Peabody and Costain based solely upon the existence of an unsolicited proposal which is superior to Peabody's. In such a circumstance, Peabody has protected itself in case it cannot meet the superior offer. This
> does not mean, however, that the provision states an adequate remedy for circumstances where there is no unsolicited bid superior to Peabody's and Costain has breached the [stock purchase agreement]. Peabody needs no monetary protection in such a circumstance because Costain has no right to terminate the contract in pursuit of the better unsolicited offer. Thus, it is the
> opinion of this Court that Peabody will suffer irreparable harm . . . .

The court therefore granted specific performance. Id. at 1422–23.

23

breaches of the merger agreement unrelated to an unsolicited receipt of a superior merger offer. 17

(iii) DQE argues that the benefits of this merger can be valued. It points out that the parties have already jointly valued one of the more important merger benefits-- the "synergies" that would arise from the merger: the Joint Proxy Statement filed with the SEC and mailed to both corporations' shareholders stated that the companies"have jointly studied the estimated synergies arising out of a combination of their companies. The companies estimated that the Merger could result in savings of approximately $1 billion over the 10-year period from 1998 to 2008, taking into account the costs estimated to be necessary to achieve such synergies." A83. Moreover, DQE contends that the other benefits of the merger identified by Allegheny "are not elusive metaphysical concepts, but rather standard business phenomena that have long been quantified and valued by economists, investment bankers and other experts in commercial cases such as this." Def. Br. at 26. But DQE has not attempted to value the other (i.e., non-synergy) strategic benefits outlined in the Joint Proxy Statement. See A83. DQE's failure even to attempt a valuation of those other strategic benefits is telling.18

(iv) DQE claims that Allegheny can bid on DQE's generating assets (which, according to DQE, are soon to appear on the block), and thus achieve one of the stated goals of the merger, "increas[ing] its generating capacity by almost one-third . . . ensuring that Allegheny will have the critical mass to compete in the generation market against its larger regional competitors." Pl. Br. at 12 (cited in Def. Br. at 28-29). Moreover, DQE argues, Allegheny can solicit

_____

17. Nor is DQE aided by its recital of statements from Allegheny officials attesting to the financial harm that the failure of the merger would cause Allegheny. See, e.g., Def. Br. at 25-26. That Allegheny's officers once thought that they would pursue damages for breach simply does not speak to the issue of whether a fact-finder could calculate those damages with any accuracy.

18. Indeed, even the synergies valuation in the proxy statement hedges: the companies "estimated that the Merger could result in savings of . . . ." A83 (emphasis added).

24

DQE's customers under Pennsylvania's newly deregulated energy market. But "critical mass" is only one of several merger benefits identified by the parties, and the statutory right to attempt to serve customers is not the equivalent of having a preexisting business relationship with them.

(v) DQE argues that Allegheny could merge with other utility companies. It offers no suggestions as to which other companies are "exactly like the one involved here," Szpakowski, 49 A.2d at 362, i.e., which other companies would demonstrably provide Allegheny with the benefits that it will lose if this merger agreement is not consummated.

Conclusion

For the reasons set forth above, we hold that Allegheny would be at serious risk of irreparable harm if preliminary injunctive relief were withheld. We will, therefore, vacate the judgment denying the preliminary injunction and remand the case to the District Court for further proceedings consistent with this opinion. On remand, the District Court should reassess -- in light of this opinion -- the three remaining factors in the four-factor determination of whether a preliminary injunction should issue.[19]

We do not read the District Court as having conclusively decided whether Allegheny has a reasonable likelihood of success on the merits. We appreciate that the District Court characterized "Allegheny's submissions on this issue [as] persuasive," Memorandum Order at 3, but do not understand this characterization as intended to be fully dispositive of that complex question. Accordingly, we think the District Court should again assess the question of Allegheny's likelihood of success on the merits.

_____

19. The district court heard oral argument and considered the parties' submissions and supporting expert witness affidavits. With the advantage of hindsight, we note that an evidentiary hearing in which the parties' experts were subject to cross-examination from opposing counsel might have benefitted the district court. Particularly where opposing affidavits duel for the key to a dispositive issue, affidavits often prove a
poor substitute for live testimony.

25

Likewise, the District Court should undertake to determine whether "whether granting preliminary relief will result in even greater harm to the nonmoving party" than the irreparable harm that denying preliminary relief would cause to the moving party. American Civil Liberties Union of New Jersey v. Black Horse Pike Regional Bd. of Educ., 84 F.3d 1471, 1477 n.2 (3d Cir. 1996) (en banc). The question to be addressed is not whether DQE "would suffer some harm," Memorandum Order at 4, or whether "there is a possibility of harm," id. at 5, but which of two potential harms -- Allegheny's or DQE's -- is greater.

Finally, the District Court should reconsider whether its reasons for finding that the public interest "weighs substantially against the granting of injunctive relief," are supported in our case law. In so doing, the District Court should determine whether its belief that the injunction would require "the court to become involved in the business affairs" of the parties presents a recognized rationale for a finding that a preliminary injunction would be against the public interest. In reassessing its belief that the injunction "could have an adverse effect through unintended collision with regulatory agencies and their statutory mandates" and thus run counter to the public interest, the District Court should bear in mind that three state regulatory agencies and two federal regulatory agencies have approved the merger, each finding that it is in the public interest; no state or federal agency has determined that the merger is not in the public interest. Cf. Schulz v. United States Boxing Ass'n, 105 F.3d 127, 134 (3d Cir. 1997) ("In determining [a state's] public policy, we turn to the enactments of the state legislature as an authoritative source.").

Combining its reanalysis of these three factors with this opinion's holding on the fourth, the District Court should endeavor to "balance[ ] these four . . . factors to determine if an injunction should issue." American Civil Liberties Union of New Jersey, 84 F.3d at 1477 n.2.

Accordingly, the judgment of the District Court denying a preliminary injunction is vacated and the case remanded for further proceedings consistent with this opinion.

A True Copy:
Teste:

        Clerk of the United States Court of Appeals
        for the Third Circuit